[FEUDAL AND CONSTITUTIONAL LAW. ASSIGNMENT BY THE HUSBAND, OF A CHOSE IN ACTION, BELONGING TO THE WIFE.]

HENRY CASSELL, *Administrator of* LOUISA BROWNING,

v.

CHARLES CARROLL of *Carrollton.*

The title and claim of Charles Lord Baltimore, his heirs and representatives, to the quit rents reserved by the Proprietary of the late Province (now State) of Maryland, was extinguished by the agreement between the heirs, devisees, and personal representatives of the said Lord Baltimore, and of his son and heir, Frederick Lord Baltimore, made in 1780, and confirmed by an act of the British Parliament in 1781.

*It seems,* that a *bona fide* assignment, for a valuable consideration, made by a husband, of a debt actually and presently due to his wife, devests, in equity, the title of the wife.

But, however this may be in general, the agreement made in 1780, including the quit-rents then actually due (if at all) to Louisa Browning, the daughter of Charles Lord Baltimore, and assigning them to Henry Harford, the devisee of Frederick Lord Baltimore, having been entered into in England, by the husband of Louisa Browning and her committee, (she being a lunatic,) and the consideration having actually gone beneficially for her use ; and the

whole transaction having been between British subjects, under the direction of the High Court of Chancery, and confirmed by an act of Parliament, transferred a complete legal and equitable title to the assignee.

ERROR to the Circuit Court of Maryland.

This was an action of debt, brought by the plaintiff in error in the Court below, for the recovery of certain quit-rents alleged to be due from the defendant to the plaintiff's intestate. The special verdict found by the jury stated the following facts.

The jury find, by their verdict, that Charles the First, in the eighth year of his reign, granted to Cæcelius Calvert, Baron of Baltimore, his heirs and assigns, for ever, in fee simple, the Province (now State) of Maryland, by a charter dated the eighth of June, 1633. Cæcelius Calvert died in 1675, and left Charles, afterwards Baron of Baltimore, his son and heir, who entered into the said Province, and was seised thereof. The said Charles, in 1711, granted, according to the laws of the Province, to Charles Carroll, Esq. father of the defendant, a patent for a tract of land containing ten thousand acres, " to have and to hold the same unto him, the said Charles Carroll, his heirs and assigns, for ever; to be holden of us and our heirs, as of our manor of Baltimore, in free and common soccage by fealty only for all manner of services, yielding and paying therefor, yearly, unto us and our heirs, at our receipt at the city of St. Mary's, at the two most usual feasts in the year, viz. at the feast of the annunciation of the blessed Virgin

Mary, and St. Michael the arch-angel, from and after the second day of April, which shall be in the year of our Lord 1723, the rent of one hundred pounds sterling in silver and gold."

The defendant inherited the said tract of land from his father, and is now seised and possessed of the same. On the 31st day of December, 1698, the said Charles Lord Baltimore executed a deed, by which he settled the Province of Maryland on himself, remainder on his son Benedict for life—remainder on the heirs male of the body of the said Benedict—remainder to the said Charles in fee. There were trusts created in the said deed, all of which are determined. The said Benedict died in 1714, and Charles, his father, in 1715. The said Benedict left issue male Charles his heir, afterwards Lord Baltimore, and proprietor of Maryland. Benedict left other sons, all of whom died without issue.

The last mentioned Charles entered into the Province of Maryland, and was seised thereof, as the law requires; and, on the 11th day of July, 1730, executed a deed to trustees, to the use of the said Charles and his assigns for life, remainder to the use of the first and other sons of the said Charles in tail male successively—remainder to the use of the said Charles in fee. There were other trusts created in the deed, but they were all determined at the death of Mary, the wife of the said Charles, which took place in 1769.

In 1692, an act was passed by the legislature of Maryland, which declares, that no manor, land,

tenements, or hereditaments whatsoever, within the Province, shall pass from one to another, except the deed or conveyance be acknowledged before certain magistrates, and enrolled or recorded. This act was in force when the indenture of the 31st of December, 1698, was executed, but the said indenture was not acknowledged or recorded. The legislature of Maryland, in 1715, ch. 47. passed an act which requires deeds, and leases for more than seven years, to be acknowledged and recorded within six months from their date. It also declares all deeds, not acknowledged and recorded, according to the provisions of the act of 1692, to be void. The deed of the 11th of July, 1730, was neither acknowledged nor recorded.

The last mentioned Charles Lord Baltimore had issue only one son named Frederick, and two daughters, one named Louisa, (who is the plaintiff's intestate,) and the other named Caroline. The said Charles Lord Baltimore, being seised of the Province of Maryland as aforesaid, made his will in 1750, and devised the Province of Maryland to trustees, for the use of his son Frederick, and his assigns, for life; remainder to the use of the sons lawfully begotten of the body of the said Frederick, successively in tail male; remainder to the daughters of the said Frederick; "and, in default of such issue, then to the use and behoof of Louisa, my eldest daughter, her heirs and assigns, for ever." Charles Lord Baltimore died seised the 23d day of April, 1751. The

said Frederick Lord Baltimore died without lawful issue, on the 4th day of September, 1771.

Louisa, the plaintiff's intestate, was married to John Browning, on the 15th day of May, 1762, and remained covert baron of the said John until 1792, when he died. The said Louisa was a lunatic from the year 1780 till the day of her death, which took place in November, 1821. She has never been in the State of Maryland since the death of her father. Letters of administration were regularly granted to the plaintiff on the 17th day of April, 1823.

Frederick, the son of Charles Lord Baltimore, entered into the Province of Maryland, and was seised thereof as the law requires. On the 1st day of July, 1761, the said Frederick, and Cæcelius Calvert, his uncle, executed a deed of bargain and sale, to Thomas Bennett and William Sharp, of the Province of Maryland, and its appurtenances, for the purpose of docking the intail of the Province. On the 8th of April, 1767, the said Frederick executed a deed of lease and release of Ann Arundel manor, and all other manors held by the lord proprietary in the Province, to Bennett Allen, and recoveries were afterwards suffered of the said manors, in pursuance of the said deed of lease and release. On the 4th day of March, 1771, Frederick Lord Baltimore made his will, and devised the Province of Maryland, and all its appurtenances, to Henry Harford.

That upon the death of the said last mentioned Frederick, Baron of Baltimore, Henry Har-

ford, the devisee named in his will, was a minor, and a ward, under the guardianship of the Court of Chancery in England, and so continued until 1779. That the said Henry Harford, as devisee as aforesaid, was recognised and acknowledged by the provincial government of Maryland, as the lawful proprietor under the charter, and by his guardians, with the knowledge and consent of the British government, entered into the possession of the government of the Province of Maryland, and received the rents and revenues thereof as proprietor, until the beginning of the disturbances which separated the United States of America from the British government. That those disturbances began in 1774, at which time the people of the Province of Maryland took the government of the said Province into their own hands, and ousted the officers of the proprietor ; and the government of the said Province so continued in the hands of the people until the dedeclaration of independence, the 4th of July, 1776. That no quit-rents, nor any revenues which fell due in the said Province after the year 1773, were paid to the proprietor or his officers ; that, after the revolutionary war, the British government paid to the said Henry Harford 60,000 pounds, as a compensation for his losses in Maryland by the revolution ; and paid to the abovementioned John Browning, and to Robert Eden, who married the abovementioned Caroline, 10,000 pounds each, as a compensation for their losses in the said Province, by the said revolution. That suits in the Chancery Court of

England were instituted in 1772, by the said Browning and wife, and the said Eden and wife, against the said Harford, to recover the Province and revenues of the said Province of Maryland, which suits continued until 1782, when the said bills were dismissed by the complainants.

In 1780, the legislature of Maryland passed an act, which declares, that " the citizens of Maryland, from the declaration of independence, and for ever, be, and they are hereby declared to be, exonerated and discharged from the payment of the aforesaid quit-rents, and that the same shall be for ever abolished and discontinued."

In 1780, an agreement was entered into in England, by deed, between Henry Harford of the first part, John Browning, the husband of Louisa Browning, and Sir Robert Eden and Caroline his wife, (the said Louisa and Caroline being the heirs at law of Frederick Lord Baltimore,) of the second part, Sir Cecil Wray, the committee of the real and personal estate of the said Louisa, (she being a lunatic,) of the third part, and Hugh Hammersley and Peter Prevost, two of the executors named in the will of Frederick Lord Baltimore, of the fourth part, all the said parties being British subjects. The agreement makes an absolute cession of the Province, and revenues, &c. from the time of the decease of Lord Frederick, to Henry Harford and his heirs, upon the payment (among other things) of 10,000 pounds to John Browning and Louisa his wife, and 10,000 pounds to Sir Robert Eden and Caroline his wife, in the manner stipulated in the

agreement.   It also provided in the event of
the restoration of Henry Harford to the pos-
session of the Province and its revenues, grow-
ing, or in arrear, for an additional sum of 10,000
pounds, for the benefit of each of said ladies, pay-
able out of the same.   The agreement further sti-
pulated for an application to the British Parlia-
ment for an act to confirm the same, and to vest in
Henry Harford and his heirs, the title to the Pro-
vince, and its revenues, with a provision that the
agreement should be void unless the royal assent
should be given to the act within three years.
The act, accordingly, passed, and was assented
to by the king within the period prescribed. · It
vests the title to the Province, and its revenues,
and quit-rents, &c. absolutely in Henry Harford
and his heirs, subject only to the payment of the
sums before mentioned, and some others not ma-
terial to be stated.

Upon this special verdict, a judgment was en-
tered in the Court below *pro forma*, by consent,
for the defendant, and the cause was brought, by
writ of error, to this Court.

The cause was argued by Mr. *Webster* and
Mr. *Raymond*, for the plaintiff, and by the *Attor-
ney General* and Mr. *Taney*, for the defendant.

It has not been thought proper to report the
arguments of counsel, at large, involving a great
variety of feudal and constitutional learning,
which the Court did not think it necessary to ex-
amine, as the cause was determined upon the
single point of the effect of the agreement made

*1826.*

Cassell
v.
Carroll.

*March* 13th
*and* 14th.

in 1780, and confirmed by act of Parliament in 1781.

On the part of the plaintiff, it was contended,

1. That the deeds of 1698, and 1730, were void under the acts of Assembly of 1692, and 1715, referred to in the special verdict; and that, consequently, Charles Lord Baltimore, the testator of the plaintiff's intestate, was tenant in fee simple of the Province of Maryland, at the time of his death in 1751.

2. If those deeds were not void, then the said testator was tenant in tail under the deeds, with reversion in fee, which reversion was a devisable interest, and was well devised to the plaintiff's intestate.[a]

3. Payment of rent to Henry Harford, or his agents, did not discharge the defendant from his liability to pay the plaintiff.

4. The act of the legislature of Maryland of 1780, which professes to abolish the quit-rents from and after the declaration of independence, is void, on the general principle of the law of nations, that a division of an empire does not affect vested rights of property, and by the special provisions of the treaty of peace of 1783, and the treaty of 1794, between the United States and Great Britain. The original charter to the first Lord Baltimore, distinguished between his public and his private character, and meant to confer upon him beneficial rights of property in-

a Calvert's lessee v. Eden, 2 Harr. & M'Henry's Rep. 279. 337. Opinion of Sir F. Hargrave, S. C. Ib. 341.

dependent of his political character as the ruler of the Province. At all events, the act of 1780 could not affect, retrospectively, the quit-rents which were then actually due, and had accrued from the death of Frederick Lord Baltimore in 1771, until May, 1780, when the act was passed.[a]

5. That the agreement of 1780, alleged to have been confirmed by act of Parliament in 1781, is no bar to the plaintiff's right of action.

Upon this last point, (which was the only one determined by the Court,) it was argued for the plaintiff, that the agreement contemplated a restoration of Henry Harford to the possession of the Province, and the payment of large sums of money consequent on that event, and that this being an essential part of the contract, which became incapable of execution by the result of the war, the agreement could not legally be enforced. It was also contended, that it was not competent for John Browning, the husband, as such, to convey the title to these quit-rents belonging to Louisa Browning his wife, so as to bar her, in case of survivorship, from the right of recovery,[b] and that, she being a lunatic, no act done by her committee could in any manner affect her rights. A mere intention to reduce into possession the wife's choses in action, has been

a *Vattel, Droit des Gens.* liv. 4. c. 2. § 22. Ware v. Hylton, 3 *Dall. Rep.* 199. 239. Georgia v. Brailsford, 3 *Dall. Rep.* 1. Terrett v. Taylor, 9 *Cranch's Rep.* 43 46. Orr v. Hodgson, 4 *Wheat. Rep.* 453. Society, &c. v. New Haven, 8 *Wheat. Rep* 464.

b *Roper. Husb. and Wife,* 204. 223. 227.

1826.

Cassell
v.
Carroll.

held insufficient to bar the widow of her right to them.[a] So, a general assignment in bankruptcy has not the effect of reducing into possession, a legacy of stock in trust for the bankrupt's wife, whose right by survivorship will be established against the assignees.[b] And a transfer of stock into the wife's name, to which she became entitled as a distributive share of personal estate during the marriage, will not be considered as a payment or transfer to her husband, so as to defeat her right by survivorship.[c] Supposing, therefore, the husband had agreed to transfer this specific claim, it would only operate as an equitable assignment; the assignee must sue in the name of the husband; and if he did not recover during the lifetime of the husband, the right would survive to the wife. But, in no point of view, could it be considered as a legal defence, or be pleaded in bar of this action.

On the part of the defendants, it was insisted,

1. That as soon as Maryland became a sovereign and independent State, the quit-rents which fell due after the declaration of independence, were due to the State, and not to the representative of Lord Baltimore. They belonged to him in his public political character as lord

a Blunt v. Bestland, 5 *Ves. Rep.* 515. Lumb v. Milnes, *Id.* 517.

b Mitford v. Mitford, 9 *Ves. Rep.* 87.

c Wildman v. Wildman, 9 *Ves. Rep.* 174. See also, Nash v. Nash, 2 *Madd. Rep.* 133. Hornby v. Lee, 2 *Madd. Rep.* 16.

proprietary, and not in his individual private capacity.[a]

2. That Henry Harford, being acknowledged by the Province of Maryland, and by the King of Great Britain, as the proprietor of Maryland, was, by such acknowledgment, the lawful proprietor, and entitled to the quit-rents until Maryland became an independent State.[b]

3. If the Province was private property, and entailable and devisable, then the entail was barred by Frederick Lord Baltimore, and the devise to Henry Harford was good.

4. If Henry Harford was not lawful proprietor, he was proprietor *de facto*, and, as such, payment to him would discharge the tenants.

5. That the treaties with Great Britain have no application to rents falling due subsequent to the declaration of independence. At all events, the act of Assembly of 1780, effectually confiscated the quit-rents due before that time, and so devested the title of whoever might be entitled to them, as to extinguish all claim to those quit-rents.[c]

6. That the agreement of 1780, confirmed by act of Parliament in 1781, bars the plaintiff's right of action.

Upon this last point, it was argued for the de-

a 2 *Bl. Comm.* 53. 288. *Co. Litt.* 244. note *b.* *Pownall, Colonies,* 48, 49. Kirk v. Smith, 9 *Wheat. Rep.* 241. 266. 282.

b 1 *Bl. Comm.* 106, 107. ˙ Derby v. Athol, 2 *Ves. sen. Rep.* 337. Penn v. Baltimore, 1 *Ves. sen.* 455.ˑ

c Smith v. Maryland, 6 *Cranch's Rep.* 306

1826.

Cassell
v.
Carroll.

fendant, that John Browning, the husband, had a
right to bind all the rights of Louisa Browning
the wife, with respect to such debts as were then
actually due and payable, and, therefore, had a
right to transfer, for a valuable consideration,
the quit-rents, actually and presently due. The
cases cited on the other side did not shake this
principle. The case of *Blount* v. *Bestland,*[a] was
not the case of a sale for a valuable considera-
tion, but of a bequest by a husband to his own
children, of a legacy due to the wife, which he
had not reduced to possession. *Mitford* v. *Mit-
ford,*[b] was the case of a general assignment of all
*his* effects by a bankrupt husband, and the Court
determined that it did not pass a legacy which
he had not reduced into possession. But the
argument manifestly admitted, that a particular
assignment of the specific legacy for a valuable
consideration would have produced the effect.
The case of *Hornsby* v. *Lee,*[c] was the sale of a
wife's reversionary, not a present interest. So,
that the power of the husband over the wife's
present debts, immediately recoverable, remain-
ed untouched by these decisions. But, in the
present case, the wife was a ward of Chancery,
and was represented by her committee in the tran-
saction, which was advantageous for her, the be-
nefit of which she had received, and now actually
enjoys. The compromise was confirmed by an
act of Parliament obtained on an application of

a 5 *Ves. Rep.* 515.                    b 9 *Ves. Rep.* 87.
c 2 *Madd. Rep.* 16

the parties, and ought, therefore, to be consider- 1826.
ed as annihilating all her claims to the subject in ︵﹀﹀︶
controversy. Cassell
v.
Carroll.

Mr. Justice STORY delivered the opinion of the *March 17th.*
Court.

This is the case of an action of debt, brought
by the plaintiff as administrator of Louisa
Browning, against the defendant, for the recove-
ry of certain quit-rents asserted to be due to the
intestate, as Proprietary of the Province of Ma-
ryland, and accruing between the years 1771 and
1780. In the Circuit Court for Maryland Dis-
trict, upon the trial of the cause upon the gene-
ral issue, a special verdict was found, upon which
that Court gave judgment *pro forma* for the de-
fendant, and the cause has been brought before
us for a final decision, by a writ of error.

The cause has been here argued with great
ability and care. Many important and difficult
points have been discussed at the bar, upon
which, if we were called to pronounce a deci-
sion, we should wish for more time and conside-
ration to mature our judgment. But, as we have
all come to a conclusion upon one point, which
finally disposes of the whole cause, it is deemed
proper at once to put the parties in possession of
our opinion, without attempting to analyse the
learning which is involved in others of more
complexity, and would require more extensive
researches.

For the purposes of the present decision, it is
assumed, (without, however, meaning to intimate

any real opinion on the subject,) that every other difficulty in respect to the title and claim of Louisa Browning to the quit-rents in controversy, is overcome, and the question of the effect of the agreement concluded between the parties in June, 1780, and subsequently confirmed by Parliament in the year 1781, is that to which the Court has addressed its attention. If that agreement, so confirmed and executed, as the case finds, extinguished, in point of law, the title of Louisa Browning to these quit-rents, and passed it to Henry Harford, there is an end to the present suit. And such, upon the best consideration of the case, in our judgment, was the legal effect of that agreement so confirmed and executed.

The agreement is quadripartite between Henry Harford of the first part, John Browning, the husband of Louisa Browning, and Sir Robert Eden, and Caroline his wife, (the said Louisa and Catharine being the heirs at law of Frederick Lord Baltimore,) of the second part, Sir Cecil Wray, the committee of the real and personal estate of the said Louisa, she being a lunatic, of the third part, and Hugh Hammersly and Peter Prevost, two of the executors named in the will of Lord Frederick, of the fourth part. The object of the agreement was to make a final settlement between the parties of all differences, and particularly to settle the title to the Province of Maryland, and all the hereditaments and revenues connected therewith. It makes an absolute cession of the Province and revenues, &c.

&c. from the decease of Lord Frederick, to Henry Harford and his heirs, upon the payment (among other things) of 10,000 pounds to John Browning and Louisa his wife, and 10,000 pounds to Sir Robert Eden and Caroline his wife, in the manner stipulated in the agreement. It farther stipulates, in the event of the restoration of Henry Harford to the possession of the Province and its revenues, growing or in arrear, for an additional sum of 10,000 pounds, for the benefit of each of these ladies, payable out of the same ; but as that event never occurred, it is unnecessary to dwell further upon it. The other sums were duly and regularly paid. The agreement further stipulated for an application to be made to the British Parliament for an act to confirm the same, and to vest in Henry Harford and his heirs, the title to the Province, and its revenues, &c. ; with a provision, that the agreement should be void unless the royal assent should be given to the act within three years. The act passed, and was assented to by the king within the period prescribed. It vests the title to the Province, and its revenues, and quit-rents, &c. absolutely in Henry Harford in fee; subject only to the payment of the sums before mentioned, and some others not material to this cause.

What is there, then, to prevent the agreement and act from having full effect ? The parties were all British subjects resident within the realm ; the act of Parliament was passed upon their own application and agreement ; all persons in interest were fully represented, so far as by

law they were capable of being represented; the conditions stipulated have been complied with; the confirmation was absolute; and the intention was, to extinguish, at law, as well as in equity, every claim of Louisa Browning to the quit-rents now in controversy.

It has been argued, that the agreement contemplated a restoration of Henry Fa ford to the possession of the Province, and the payment of large sums consequent thereon; and that, this being a material ingredient in the contract, which became incapable of execution, the agreement ought not to be enforced, or held obligatory. It would be a sufficient answer to this objection, that the parties, at the time of the execution of the agreement, knew perfectly well that the Province had assumed independence, and that the chance of restoration depended upon the issue of the war then waged between the United States and Great Britain. They acted upon that state of things, and provided for the payment of these additional sums, only in the event of an unsuccessful struggle on the part of the Province. The stipulation, therefore, has not failed, in point of consideration, from the misconduct of either party; but the event, in which alone it was to have any effect, never has occurred. The payment was conditional, and the condition has never arisen, upon which alone the contract could act.

But there is another answer presented by the very terms of the agreement itself. It is, that the parties expressly agreed, that the title to the

Province, &c. should vest absolutely upon the payment of the first 10,000 pounds; and, of course, the other provisions were to rest in covenant only between the parties, and were not to be construed to defeat or devest that title. The act of Parliament treats it in that way, and vests the title in Henry Harford in fee, conclusively.

1826.

Cassell
v.
Carroll.

It has been further argued, that it was not competent for John Browning, the husband, as such, to convey the title to these quit-rents belonging to his wife, so as to bar her, in case of survivorship, from the right of recovery; and that, she being a lunatic, no act done by her committee could in any manner touch her rights.

It is to be recollected, that the quit-rents, as claimed, were debts then actually due (if at all) to Louisa Browning. They were not future contingent or reversionary interests vested in her. How far, in respect to such interests, the husband, or the committee of a lunatic, is by law authorized by a conveyance or assignment to dispose of her rights, is a question which we are not called upon to decide, and upon which we give no opinion. The case here, is of choses in action actually due to the wife. There can be no question, that he was entitled to receive them to his own use, or to extinguish them by a release. What, then, is there to prevent him from disposing of them by assignment, at least in equity?

*Quære,* How far contingent or reversionary interests of the wife, may be assigned by the husband?

It does not appear to us that it has ever yet been decided, that a *bona fide* assignment for a valuable consideration, made by a husband to a third person, of a debt actually and presently

*It seems,* that an assignment by the husband, of a debt actually due and payable to the wife, devests, in equity, the title to the wife.

due to his wife, does not devest, in equity, the title of the wife. So far as authorities have gone, they seem to proceed upon a different and opposite doctrine. The cases of *Lumb* v. *Milnes*, (5 *Ves. Rep.* 517.) and *Mitford* v. *Mitford*, (9 *Ves. Rep.* 87.) are distinguishable. They were cases of a general assignment under the bankrupt laws, which are not supposed to do more than place the assignees in the same situation as the bankrupt himself. The case of *Hornby* v. *Lee*, (2 *Madd. Rep.* 16.) turned upon another distinction, that the interest was not a present, but a reversionary interest. But, without deciding any general principle, we think, that under the particular circumstances of this case, where the consideration has actually gone beneficially for the wife, and the whole transaction has been under the direction of a Court of Chancery, and been confirmed by Parliament, the assignment was, to all intents and purposes, valid to assign the rents. If, in ordinary circumstances, such an assignment would pass an equitable title only, we think the act of Parliament makes it, to all intents and purposes, a legal title and assignment. Without dwelling upon the known principles of the paramount and omnipotent authority over private rights and authorities, which is often attributed to Parliament, it may be justly said, that it is competent for the legislature, upon the application, and with the consent of all the parties in interest, to give a legal and conclusive effect to their own agreements, and to pass that at law, which the parties, in the most

unreserved manner, intended to pass. A title so passed, and so confirmed, by authorities perfectly competent to make it, ought, under such circumstances, to be recognised as valid in the tribunals of every other country.

This is a summary exposition of the views of the Court upon this subject; and it at once disposes of the whole matter in controversy. The judgment of the Circuit Court is, therefore, affirmed, with costs.[a]

---

*a* Mr. Justice DUVALL, being a landholder in Maryland, did not sit in this cause.(1)

(1) The editor has supposed that it would gratify the curiosity of the learned reader, to be presented with the following note (with which the editor has been favoured by his friend Mr. Taney) of an argument in the Court of King's Bench, in 1775, upon a case sent from the Court of Chancery, in the suit brought by Sir Robert Eden and Others against Henry Harford, to recover possession of the Province of Maryland and its revenues, in which the learning respecting the nature of the dominion and proprietary interest of Lord Baltimore in the Province, was very elaborately discussed.

"Trinity Term, 15 Geo. III. B. R. Tuesday, 27th June, 1775.
" HARFORD v. BROWNING.

" Mr. Serjeant *Hill*, for Mrs. Browning and Mrs. Eden.

" He first stated the case, and when he had finished this, Lord *Mansfield* asked, in what shape the cause came before the Court, and for whom Mr. Serjeant Hill was to argue. The Serjeant answered, that the case came from Chancery to know whether the last lord had a right to devise; and that, if he could not, it was the same to Master Harford whether the property went to Mrs. Browning and Mrs. Eden, the last lord's sisters, as co-heirs of the first grantee of Maryland, or to Mrs. Browning alone, as devisee of her father. Lord Mansfield then observed, that there would have been no question if the estate had been situate in England, and

1826.

Cassell
v.
Carroll.

that the ground of the doubt was its being a seignory and proprietary government in America.

"Mr. Serjeant *Hill* proceeded in his argument to the following effect:

"The general question is, whether the Province, and proprietorship, and port duties of Maryland, are well devised by the will of the last Lord Baltimore; and to show that they could not pass, I shall submit two general points:

"1. That the property is so high in its nature, and, in other respects, so peculiar, as not to be devisable.

"2. That the subsisting entails were not well barred by the last Lord Baltimore, either because he did not do the proper and necessary acts for barring, or because such entails were not capable of being barred in any way.

"1. I apprehend, that the proprietorship of Maryland is not alienable without the license of the crown, and much less devisable.

"The design of the Maryland charter was to erect a Province in the District called Maryland, to establish a form of government similar to our own, and to place Cæcil Lord Baltimore, and his heirs, at the head of it. The highest powers are conferred, and, perhaps, the crown's right to grant some of them may be doubtful; but it is not necessary to this case to determine which could, and which could not, be granted. The charter gives royal jurisdiction, and a royal seignory. Of the first kind are the powers of enacting laws with the consent of the Assembly, of erecting Courts, of appointing magistrates, of punishing criminals, and of levying men, and all the powers of war and peace. Of the second kind is the power of making subinfeudations. The charter reserves a tenure of the king as of the castle of Windsor; for the law would otherwise have created a tenure *in capite*. The king cannot grant without reserving a tenure, for he cannot change the principles of the constitution, one of which is, that there must be a tenure. The king constituted Lord Baltimore the lord and proprietor of the whole Province. There is no instance before of the grant of a proprietorship. But, though there was not before any such sovereignty in name, yet, in specie, there was such a property, and the Counties Palatine of Chester and Durham, resembled it. From the high nature of these powers and jurisdictions, I argue, that the Province could not be aliened without license of the

crown, nor could it be a subject of the statute of wills. At the time of that statute, no such high property existed in the empire. The 32d of Henry VIII. in giving the power of devising, mentions *manors, lands, tenements, and hereditaments.* It begins with *manors,* and though *hereditaments,* which is the last word, would, singly, have been sufficient to have extended to this property, yet, coupled with the former words, it is not so. The 13 Eliz. cap. 10. s. 3. begins with enumerating deans, &c. and then adds, *all others* having spiritual or ecclesiastical promotions; but bishops and archbishops being higher than deans, are not included. So, the statute of wills, beginning with *manors,* shall not extend to a higher dominion, such as proprietary government. Dependent kingdoms are not devisable without the consent of the superior prince. Dominion is not the subject of testamentary disposition; and Craig says, that all feudists agree in this. Nor are things given for the support of dominion, such as the *port duties* here, in their nature devisable. With us the king cannot devise the lands and revenues allotted for the support of his royal dignity. This, indeed, has not been the subject of judicial decision; and in the *Bankers' case,* Lord Somers, though he reversed the judgment of the Court of Exchequer, avoided this point; but our kings never attempted to exercise such a power. See 5 *Mod. Rep.* 46. and Lord Somers' argument in the Banker's case. The 9 and 10 Wm. III. cap. 23. which gave a revenue to King William for his life, recites to be for his household and family expenses; and now, by the Civil List Act of Queen Ann, the alienation of the crown revenue is expressly provided against. But, even before the Civil List Act, there is no instance of a devise of the royal revenues. In the present case, it could not be intended that the port duties should be alienable. The port duties were created for the benefit of the subject, and they, and the proprietorship, were intended to go together. But, I insist further, that the lands themselves are not alienable. Anciently, when the king made a duke, and gave possessions to him, they were so annexed to the dignity as not to be transferrable without a preceding act of Parliament. See *Godb.* 397. In *Dyer,* fol. 2. a. there is a case very analogous to the present; for there it is said, that if the king creates a duke, and gives him 20 pounds a year for the maintenance of his dignity, he cannot give it to another, because it is not incident to his dignity. Many things, of a special nature, are unalienable. Digni-

1826.

Cassell
v.
Carroll.

ties are so, because they are personal, and in the blood. Offices of trust are not assignable, unless by the original terms of the grant, or by prescription, which supposes such a grant Ministerial offices are, indeed, assignable, and the power of appointing a deputy is incident where the office is assignable, but not *vice versa*. See *Bro. Abr.* tit. *Office*, pl. 108. The office of forrester is of such a trust that it cannot be granted over without license. 4 *Inst.* 315. The *Register* and *Fitzherbert*, there cited, warrant Lord Coke in his doctrine. Earldoms are not alienable. The case about the office of Great Chamberlain in *Sir W. Jones*, 96. and *Collins' Baronies*, contain much learning on this subject, which applies strongly here. Doddridge, who was with the majority of the Judges, states every thing which made against his own opinion.

" Lord *Mansfield*. The case is very well reported both in *Sir W. Jones*, and in *Collins ;* but there is a great difference between offices and territories.

" Mr. Serjeant *Hill*. The Judges who held the office alienable, only held it partly so, that is, that it might be settled so as to keep it in the male line ; because males were more fit for the office than women. But, they agreed, that, though the office was granted in fee, it could not be disposed of from the blood of the first grantee. In the present case, it is observable, that the charter makes a difference in the use of the word. *assigns*. That word is used in granting the land, but it is omitted where the charter gives the power of calling assemblies, and enacting laws, of appointing Judges, and of pardoning crimes. Therefore, these powers, at least, were not intended to be alienable.

" 2. If the whole of the property, or any part, is disposable by will, it must be so on this ground, that all the statutes and laws of England in force at the time of the settlement of Maryland, attached on the Province, though subsequent statutes will not extend to it without express words, Then I have a right to assume, that the property is entailable ; for the statute *De Donis* was an existing law at the time of the grant and settlement of the Province, as well as the statute of wills, and so was the statute of uses. Now, the property was entailed, and, upon the supposition that the entail was within the statute *De Donis*, I argue, that the entail

was not well barred by the last Lord Baltimore, and that this gives
a title to his sister, Mrs. Browning, all the entails bein now spent
for want of issue male, and she being the devisee of the reversioner
in fee, by the will of her father.

" Lord Baltimore's mode of barring was by lease and release, a
conveyance the weakest of all in its operation.  Before *Machell
& Clarke*, it was understood, that such a conveyance, by tenant in
tail, would only pass an estate during his life; and, even accord-
ing to that case, the estate it passes is voidable on his death by
entry of the issue in tail.  See *Machell* v. *Clarke*, 3 *Lord Raym.
Rep.* 678. 2 *Salk. Rep.* 619. 7 *Mod. Rep.* 18. and *Com. Rep.*
119.  As against those in remainder, it still passes only an estate
during the life of the tenant in tail.  But, a feoffment, without
warranty, would have been a discontinuance, and, with warranty,
when it becomes collateral, it would have become a bar at this
day ; for the statute of Ann doth not take away the effect of colla-
teral warranty when it is by a tenant in tail in possession.  See
4 and 5 *Ann, c.* 16.  Therefore, I say, that this was one mode by
which Lord Baltimore might have barred the entail; because, if
he had made a feoffment with warranty, the warranty would have
been collateral to Mrs. Browning.

" But there was another mode of barring which might have
been used.  The Province of Maryland is a fief holden of the
king *as* of the castle of Windsor, for so the tenure is reserved.
*As*, in the grant, is not similitudinary, but is the same as *ut* in
pleading that one was seised *ut de feodo*, which, says Lord Coke,
is to be understood positively that the party was seised in fee.  *Co.
Litt.* 17. 6.  The tenure, then, being as of the castle of Windsor,
the Province is to be considered in the same way as other lands
originally holden of the castle, and, like other fiefs, is to be im-
pleadable within the manor.  A castle, or honour, is only a supe-
rior kind of manor.  To every manor a Court Baron is necessa-
rily incident, and, therefore, it is so to every castle.  The
jurisdiction of a Court Baron is well known:  Without the
king's writ, it holds plea of personal actions where the de-
mand doth not amount to 40 shillings.  With the king's
writ of right, it may hold plea of land.  Writs of right are of
two kinds, *patent* and *close*.  If the writ is brought in the Lord's
Court, it is directed to him, and is *patent*.  If he holds no Court,
or waives, or the tenure is immediately of the king, it is brought in
the King's Court, is directed to the Sheriff, and is *close*.  *Magna*

*Charta*, c. 24. provides against the abuse of the writ of right in the latter case, by declaring, that *præcipe in capite* shall not issue where the land is not holden *in capite*. But the practice is otherwise, and the writ of right has been usually brought in the Common Pleas in all these cases. Another writ of *right close* lies for lands in ancient demesne. This writ is well known, and recoveries are suffered upon it in the Courts of ancient demesne. See *Fitzh. Nat. Br.* and *Booth on Real Actions*. The general writ of right patent lies in the Court of the Manor, in all cases where the tenure is of the subject, or of the king, as of an honour; and where the estate lies, makes no difference. 4 *Inst.* 219. and *Fitzh. Abr. Jurisdiction*, pl. 61. there cited.' If a man holds lands as of an honour, the bailiff may execute the process as of the Court of the honour, wherever the lands lie. In the case in *Fitzh. Abr.* it was objected, that the officers of the county palatine of Chester, could not execute writs in a foreign county; but it was adjudged otherwise, because the lands were within a manor holden of the principality of Chester.

" There are many precedents of recoveries on writs of right patent. One is in *N. Bendl.* p. 4. pl. 4. on a writ of right patent directed to the bailiff of the castle of Rising. According to this ancient principle, that wherever a fief lies it is impleadable in the manor of which it is holden, the Province of Maryland might have been impleaded in the Court of the castle of Windsor, for it is clearly holden of the castle, and there is a Court Baron necessarily incident. True it is, that if the tenant pleads a foreign plea, or the mise is joined on the mere right to be tried by the Grand Assize, the cause must be removed into the Common Pleas. But, I insist, that a writ of right patent might have been brought in the Court of the castle of Windsor, and that a common recovery might have been suffered; because, then, neither foreign plea, nor joining of the mise, on the mere right by the grand assize is necessary. The precedent cited from *N. Bendl.* is in point; and conformable to the principles I am arguing upon. The writ of right patent was for a manor holden of Rising Castle, and was directed to the bailiffs of the castle. It appears clearly, that there was a recovery in the Court of Castle Rising. There was a plaint by the demandant, the tenant vouched to warranty, and the vouchee making default, judgment was given for demandant. Afterwards, a writ of false judgment was brought in the Common Pleas by the

vouchee, and tne error was, that the writ of right patent should have been directed to the suitors; but the Court held, that the bailiffs were the proper persons, and the judgment was affirmed. See *Mod.* 1. Another instance of a like proceeding in the Court Baron of the Manor of Wolverhampton, is in *Robbins' Ent.* 323. There, false judgment was brought on this error, that the lands were not mentioned to be within the manor; but the judgment was affirmed. In *Rastell* there are several instances of writs of false judgment on judgments in writs of right close in Courts of ancient demesne. *Rast. Entr.* 221. b. Also, *Booth* states the manner of proceeding in the Court Baron on a writ of right patent, where the cause is not removed. *Booth on Real Actions*, 89. If, then, a recovery might be had on a writ of right in the Court Baron, when the proceeding is adverse, much more might a common recovery be suffered. Errors in common recoveries are aided by the statutes of jeofails, and no objection is fatal to them but such as might be pleaded to the jurisdiction of the Court where they are suffered. But how could such an objection hold in this case? Every plea to the jurisdiction must state, that there is another Court in which the cause may be tried, and which that Court is. Therefore, if want of jurisdiction is objected to the Court Baron of Windsor Castle, it should be stated where else the Province of Maryland can be impleaded; for fines have been levied in the Court of Common Pleas here, of shares of a proprietorship in America. The only proprietorships at present are Pennsylvania and Maryland; but Carolina was once a proprietorship, and whilst it was so, fines were levied here of shares in it. The first grant of Carolina was to eight persons, and the word *assigns* was used throughout. *Scire facias* was brought to repeal the letters patent; but no judgment was ever given, for the proprietors were well advised, and agreed to surrender, and an act was made to confirm the agreement. See 2 Geo. II. c. 34. Though the proprietors were seised in fee, yet this act recites, that from the nature of the estates proposed to be surrendered, great difficulties might arise as to the manner of conveying. In the present case, like difficulties induced the advisers of the last Lord Baltimore to recommend the applying to Parliament; but no act was obtained.

" Lord *Mansfield*. He was stopped by the difficulty of proceeding.

" Mr. Serjeant *Hill*, The last thing I have to submit is, that if no recovery could be suffered, and feoffment with warranty would not have been sufficient, then the entail was not barrable in any way, and the Province of Maryland was in the same condition as land here, before the introduction of common recoveries, and of barring by fine under the statute of Hen. VII. Like an executory devise, the entail is not barrable, because a recovery cannot be suffered. See the case of *Scatterwood* v. *Edge*, 12 *Mod. Rep.* 278. The words of Lord Hardwicke, in 2 *Ves. Rep.* 353. are very applicable. In speaking of the limitation in the act of Parliament, which made the Isle of Man unalienable, he says, that if they were considered on the foot of the statute *De Donis*, and they were estates tail, there was no want of a restrictive clause; for, before *Taltarum's case*, which established the doctrine of recoveries, and the 4 of Hen. VII. of fines, these, by the statute *De Donis*, were unalienable, and of Man there could be neither fine nor recovery. Here, I say, that the property is not entailable; but, if it is, it must be because within the statute *De Donis*, and, if that statute operates upon Maryland, and no recovery could be suffered, there was a perpetuity. It is absurd to say, that there must be the means of making property alienable because it is within that statute; for the statute was made to restrain alienation. A recovery might have been sufficient to bar; but the conveyance by lease and release is too mild in its operation, and on such a conveyance by tenant in tail, the old use reverts to the releasor.

" The capability of losing in an action is a very different thing from the power of alienation. What is the objection to a perpetuity in such a case as this? Can any useful end be attained by making a sovereignty alienable? The cases of copyholds are not authorities in point, for they depend on custom. Here Mr. Serjeant Hill cited many authorities to confirm and illustrate some of the doctrine he had advanced in the previous part of his argument. He cited *Co. Litt.* 108 *a.* *Dy.* 44. *a.* and *Bro. Abr. Tenure,* 94. to show the difference between tenure *ut de corona*, and *ut de honore*, and that it was in the king's option to reserve either; *Co. Litt.* 17 *a.* and 1 *Lev.* 222. to prove the word *ut affirmative*, and not similitudinary; *Co. Litt.* 5 *a.* 2 *Inst* 31. and the *Register,* to prove a castle contains a manor; and 4 *Inst.* 26. *Hob.* 170. and 2 *Bro. Abr.* 45. to prove that a Court Baron is incident to a manor, and that they are inseparable. For, the distinction

between writs of right patent, and writs of right close, and the causes of removal, and that where the former lie, they may be preferred to the latter, he cited *Fitzh. Nat. Br.* 1. to 9. and 11. to 14. *Old. Nat. Br. Fitz. Abr.* tit. *Droit*, pl. 45. *Magna Charta*, cap. 24. and *Bro. Abr.*—To show that it was immaterial where the land happened to lie, he cited *Fitzh. Abr.* tit. *Jurisdiction*, pl. 61. and 4 *Inst.* 219. He then observed, that the king might make a new island arising out of the sea part of a county, and for this he cited *Collis. on Sew.* 45. and asked why he could not make a province part of an honour. He also cited from 1 *Str. Rep.* 177. the case of the *King* against the *City of Norwich*, (which was the case of an information against the latter for not repairing some bridges,) to show that the king may enlarge, contract, or vary the bounds of a county, for the purpose of jurisdiction. He next mentioned, a second time, that fines had been levied of shares of the Carolina proprietorship; and added, that error on a fine of land in America had been brought in B. R., and that it might be proper to search, in order to know what was done.

"Lord *Mansfield.* Fines, and recoveries of plantations in America, with a viz. to bring them within a parish here, were frequent in the Court of Common Pleas, till provincial laws were made to provide other modes of barring. But I do not know of any instance of such fines or recoveries in the case of a seignory.

"Mr. Serjeant *Hill.* In 1 *Ventr. Rep.* 258. Lord Hale says, that the writ of right close (for lands in ancient demesne) is not to be resembled to another *præcipe*, and that being directed *ballivis manerii*, mention of the manor, without naming the will in which the lands lie, is sufficient. So, here, mention of the castle of Windsor in the writ of right patent, without a viz. to bring Maryland within England, would have been sufficient. Lord C. J. North, in 2 *Mod. Rep.* 49. observes, that it had been long a dispute whether a fine of lands in *lieu conus* was good; that in King James's time it was settled to be so, and that, by the same reason, a recovery shall be good; for they are both amicable suits and common assurances, and as they grow more in practice the Judges have extended them further. He adds, that a common recovery may be of an advowson, and that no reasons are to be drawn from.

VOL. XI. 21

1826.

Cassell
v.
Carroll.

the visne, or execution of the writ of seisin, because it is not an adverse proceeding, but by agreement. This is material, for common recoveries of advowsons were anciently in writs of right; and though writs of entry are now used, they are improper for an advowson, and they are only allowed because common recoveries are by agreement. This is material, for common recoveries of advowsons were anciently in writs of right; and though writs of entry are now used, they are improper for an advowson, and they are only allowed because common recoveries are by agreement. The observation about the writ of seisin answers the reason in 1 *Ventr. Rep.* 59. why an ejectment of lands in Jamaica will not lie here, and shows that it is not applicable to the present case. That where one jurisdiction is pleaded to, another must be shown, I cite *Barker* v. *Dormer*, 1 *Show. Rep.* 191.; and that a seignory out of England may be impleaded in the Courts here, I cite 4 *Inst.* 213. *Bro. Abr. Jurisdiction*, 101. *Lien*, 75. *Trial*, 58. *Fitzh. Abr. Assize*, 282. *Vaugh. Rep.* 405. As to suing for ancient demesne lands, I cite 1 *Salk. Rep.* 56. and 1 *Lord Raym. Rep.* 43.

" Upon the whole, the property in question is neither alienable nor devisable, or, at least, the seignory is not so. If the property is both alienable and devisable, then, I insist, that it is entailable, and that the entail is not barred.

" The supposed necessity of barring by lease and release, doth not exist; for,

" 1. There might have been a feoffment with warranty, and, 2. The Province being holden of Windsor Castle, is impleaded in the Court Baron there, and a common recovery might have been suffered there. Besides the authorities already cited, to show that the bailiffs of that Court were officers competent to hold plea of the Province in a writ of right patent, there is one in *Aston's Entr.* 375. If a recovery could not be suffered in the Court of the Castle of Windsor, it might have been suffered on a *præcipe quod reddat* in the Court of Common Pleas; and the property not being in England was no objection to a recovery, either in the Common Pleas, or the Court of Windsor Castle. If it is denied, that a recovery could be suffered in either of these Courts, it must be shown what Court has the proper jurisdiction, or the objection cannot be taken. If a recovery could not be suffered any where, then I insist, that the entail of the property made it unalienable,

and that it descended as a perpetuity ; and that it might so descend, I cite the authority of Lord Hardwicke in 2 *Ves. Rep.* 353. and of *Jenkins* in his *Centuries*, 250. and 257.

" Mr. Serjeant *Hill* concluded with citing a case about the writ of right patent in 6 *Co. Litt.* 11.

" Mr. *Kenyon*, for Master Harford. The principal questions in this case, arise on the grant by the crown of the Province of Maryland in the 8 Charles I. and the settlements made of it in 1730, and 1761. The grant by the crown being by letters patent under the great seal of England, the law of England is, therefore, the rule by which the property must be adjudged upon. It has been truly observed by the Court, that no points could arise, if the property was in England. If the property was situate here, it would be alienable, devisable, and entailable, and the entail might be barred by common recovery. But the property lies in America, and thence arise the difficulties.

" The questions referred to this Court concern both the Province and the port duties, and their value is great. But the great value and extent of the property will not make any difference in deciding upon it, though its situation will. The Province of Maryland was settled by Englishmen, and these carried the law of England with them. In 2 *P. Wms.* 75. it is said to have been adjudged by the Privy Council, that if a new country is found out and settled by English subjects, they carry their laws with them, though subsequent acts of Parliament, without naming, will not bind the plantation. The like doctrine is laid down in *Penn v. Baltimore*; 2 *Ves. Rep.* 349. with more precision ; for, there it is said, that an English colony carries with them all the laws of England in being at the time of planting it, which are adapted to the situation ; but that no statute, made afterwards, binds without naming them. Now, both the statute *De Donis*, and that of Wills, were before the settlement of Maryland, and both have words sufficent to comprehend the proprietorship, the word *tenement* being used in the former, and *hereditament* in the latter. Therefore, both statutes must extend to the property in question, unless it can be shown that there is something incongruous in applying them to Maryland. But they are necessary and convenient laws for Maryland, nor is the law of descents more so. It is objected, that these statutes may extend to lands granted to the Lord Proprietor

1826.

Cassell
v.
Carroll.

in the way of subinfeudation, but that they ought not to be applied to the seignory and proprietorship. But no reason is given for the distinction, except saying, that the proprietorship is a transcendent property, and hath regalities and high powers annexed to it. Is an assignee or devisee less likely to be fit and able to govern it, than the descendants of the first grantee, who may be infants? Higher property than this hath been the subject of wills; for kingdoms have been devised. Constantine devised an empire, and so did Charlemagne; and the same was done in our own country by Hen. VIII. under an act of Parliament. It is said, that the property is not alienable, because it is annexed to an office of trust. But, lands to which offices are annexed, may pass together with the office. When the champion of England passes his manor, his office passes with it. The Province of Maryland may be resembled to a large manor. The jurisdictions of some manors were anciently as extensive, both in criminal and civil matters, as the jurisdiction of the lord of Maryland. The power of making by-laws to regulate commons, and other subjects, relative to the tenants, is incident to many manors.

" But the question doth not depend merely on arguments of analogy. The proprietorship is granted in free and common soc-eage, and it was intended to be alienable. The word *assigns* is used in the letters patent, and, in some places, is applied to the seignory itself. The first grantee would not have accepted the grant on other terms. We should consider, not the present value of the property, but its value when the grant was made ; and then Maryland was a desert, and it is not to be supposed, that the first grantee would have been at the expense of settling it, if it had not been made alienable. Besides, the usage since the grant, is an argument in favour of its being alienable. Both Maryland and Pennsylvania have been constantly subjects of entails and settlements, and this practice ought to weigh something. Another strong argument arises from the preamble of the statute 2 Geo. II. c. 34. about the shares of the Carolina proprietorship. In deriving titles to the several shares, wills are mentioned. This shows that it was deemed to be within the statute of wills. The preamble also recites a cause in Chancery about an agreement to sell the share of one Dawson, and a decree by the Lords for a specific performance, on an appeal. The preamble further recites various grants to show title in those with whom the crown was contracting

for the surrender of their shares. All this shows, that Parliament thought a proprietorship in America alienable like other property.

" Lord *Mansfield.* In Dawson's case, the question between the parties was not about the power of alienating.

" Mr. *Kenyon.* The statute of 7 and 8 Wm. III. c. 22. s. 16. is also of consequence, for it restrains all persons, and their assigns, claiming any right or *propriety,* in any islands or tracts of land on the continent of America, by charter, or letters patent, from selling to any but natural born subjects. This act supposes a proprietorship to be alienable.

" Lord *Mansfield.* The clause in the act of William is odd. Without such a restriction, aliens were incapable of purchasing.

" Mr. *Kenyon.* In *Penn* v. *Lord Baltimore,* the question of alienation actually occurred ; and though it was not necessary to decide upon it, yet Lord Hardwicke seems indirectly to have given an opinion, that the proprietorship of Maryland was alienable. See 1 *Ves. Rep.* 448.

" Lord *Mansfield.* The question before Lord Hardwicke was on the effect of an agreement between the Penn and Baltimore families, about the limits of Maryland and Pennsylvania, it being contended that Lord Baltimore had not power to dismember his Province, though he might make subinfeudations ; but the question was determined without deciding any thing on the power of alienating the whole Province.

" Mr. *Kenyon.* I cite the case for the sake of Lord Hardwicke's *dictum,* and not as an adjudication. Thus, I am in possession of the opinion of the Legislature, and of the House of Lords, and of Lord Hardwicke, as authorities to show, that the property is as alienable as other property. It remains to show, that the entail was well barred by Lord Baltimore, so as to enable him to dispose by will ; and this Mr. Serjeant Hill makes the great point. The question is as to the whole Province and seignory, and not as to any particular parts or subinfeudations. If it had arisen on the

**1826.**

**Cassell**
**v.**
**Carroll.**

latter, the forms required by the provincial laws might have been complied with. But no Court within the Province can hold plea of the seignory itself. See *Vaugh. Rep.* 404. If no Court can be found in Maryland for a common recovery, some other Court must be found, or there must be some mode of barring the entail without a recovery. When this cause was before the Chancellor, Mr. Serjeant Hill said, that a recovery might have been suffered before the king in council; but that ground is now deserted.

" Lord *Mansfield.* If any thing had been done for barring there, it could only have been a proceeding having analogy to common recovery, the council being the proper place for adverse proceedings about the title to Maryland. The jurisdiction over all the seignories of the Provinces in America, has resided in the Privy Council from the time of Elizabeth.

" Mr. *Kenyon.* Two places for suffering a recovery have been mentioned; the Court of Common Pleas, and the Court of the Castle of Windsor. As to the former, it is said, that fines have been levied of lands in America, with a viz. to bring them within England. But the plea for land is local, and it is impossible by a viz. to transfer the place to England; and two or three precedents are not sufficient for this purpose. As to the Court of the Castle of Windsor, I admit, that one manor holden of another may be pleaded for in the principal manor; but I do not know of any instances in which there can be such a plea, except the cases of copyhold, and of lands in ancient demesne. Besides, how is seisin to be given of Maryland by a Court Baron in England? It is said, that a recovery may be on a writ of right in the Court Baron of Windsor Castle; but, if such a Court exists, (which I do not admit,) it is allowed, that joining the mise carries the cause to the Common Pleas, and the moment the suit comes there it fails, for that Court cannot give seisin; and this deficiency, according to the case of the Isle of Man, in 2 *Ves. Rep.* 353. would make the recovery ineffectual. It is said, that Maryland might have been annexed to a county in England; but the answer is, that it is not so annexed. Further; it doth not appear that a Court Baron is incident to the castle of Windsor. Such a Court may belong to the honour of Windsor; but Maryland is holden of the castle, and

the castle and honour are distinct. A castle may be part of an honour or manor. *Fitzh. N. B. 6 D.* I am told, that the only Court belonging to the castle is for personal actions.

" If the entail was not barrable by common recovery, it is to be considered whether an alienation by some other common assurance is not sufficient. The mode by Lease and release, is found fault with; but this conveyance is founded on the statute of uses, and, since that statute, it passes the fee as well as any other. As to feoffment with warranty, in general, it would have failed : and I am not sure that it would have had the proper offect in the case which hath happened, because, here, the warranty would have descended both on Mrs. Browning and Mrs. Eden, as heirs of their brother; and, on the supposition that the property is entailable, to prevent perpetuities, the entail must be barrable in some way. In general, the power of barring by common recoveries, is incident to entails; and if that mode had not been adopted, the other modes would have been found out. Where common recoveries cannot be suffered, alienation is sufficient; and whether it be by feoffment, or lease and release, the effect ought to be the same. In the case of copyholds, where there is a custom for entailing, and no custom for a common recovery, a surrender is equivalent to a recovery. This point was adjudged by three Judges against one, in *Carr* v. *Singer*, 2 *Ves. Rep.* 603. and the doctrine was approved of by Lord Hardwicke in a subsequent case. See *Moor* v. *Moor*, 2 *Ves. Rep.* 601. which case, though given by the reporters before *Carr and Singer's*, is subsequent in point of time. These authorities alone are sufficient; but the same principles in favour of alienation are to be met with in ancient books. In *Willion* v. *Berkley, Plowd. Rep.* 244. Judge Weston argues on the principle, that every estate tail is barrable; and, in *Mary Portington's case*, 10 *Co. Litt.* 40 a. Lord Coke mentions, that Lord Dyer, in a case before the Lords in Parliament, reproved one of the counsel for finding fault with common recoveries. But, besides the cases of copyholds, I have another authority, to show that complying with the law of England as nearly as circumstances will allow of, is sufficient. I have in my hand the report of a committee of the Privy Council in the case of Governor Wentworth, who was complained of on various charges. One of these was, that he had set aside grants of land, in the American Province of which he was Governor, without office, according to the forms of the law of

England; and the Lords of the Committee of the Privy Council, one of whom was Sir Eardly Wilmot, say, in their report, that in some of the American Provinces they have not Courts so correspondent to those in England as to admit of the same forms, and that, in such cases, if a mode of doing the same thing *cy pres* is adopted, it ought to be good *ex necessitate*. See p. 10. of the Report. This doctrine is applicable to the present case. The property is entailable, but a common recovery cannot be suffered for want of a proper Court, and, therefore, *ex necessitate*, alienation being the only mode of barring the case will admit of, ought to be adjudged sufficient.

" But, if the property is not within the statute *De Donis*, and yet should be within the statute of wills, it may be material to consider what consequences will follow. Then, under the settlement of 1733, the last Lord Baltimore had a fee simple conditional, and if a possibility of reverter is not grantable, as Lord Hardwicke holds in *Stafford* v. *Buckley*, 2 *Ves. Rep.* 180. then the possibility of reverter, in this case, did not pass to Mrs. Browning by the will of the father of the last Lord B. but descended on him, and, for want of an intervening estate, the former merged in the latter. During the life of the father of Lord Frederick, they were distinct ; but, after the father's death, they met in the son, and this union gave him the whole fee.

" Lord *Mansfield*. A possibility of reverter is certainly not grantable.

" Mr. *Kenyon*. As to the Isle of Man, there is an annotation by Lord Hale in the new edition of *Coke upon Littleton*, now publishing, which explains the reason why the statutes *De Donis*, of uses, and of wills, do not to extend to Man, in a way not applicable to Maryland. Man was a dominion belonging to the King of England before those statutes ; and Lord Hale says, it was ruled, that those statutes do not extend there, because Man was not parcel of the realm of England, and is not specially named. But the grant and settlement of Maryland are subsequent to those statutes. See 20 b. of the new edition of *Co. Litt.*(1)

" Lord *Mansfield*. It will be very proper to consider the case of

(1) *Hargr. & Butlr.* ed.

the Isle of Man in 4 *Inst.* and 2 *Anderson.* Both Maryland and Man are dominions held of the crown of England; and the grant of Man to the Derby family was prior to the statute *De Donis,* and yet the Judges held, that it did not extend to it, any more than the statutes of uses and wills, which were subsequent. The case of the Duke of Athol and the Bishop of Man, should also be considered. Lord Hardwicke took great pains in giving his opinion in that case. He gave me a corrected note of his opinion, and another to the Duke of Athol.

1826.

Cassell
v.
Carroll.

" Mr. Serjeant *Hill,* in reply. It is agreed, that if the property was in England, the case would be clear against the devisee of Lord Baltimore for want of a recovery; and it has not been shown that a recovery was impossible. The distinction between the land and port duties has not been answered. They were separated by King William. He seized the former, but did not touch the latter. The distinction between sovereignty and mere land is solid. The case from 2 *P. Wms.* 75. was cited to prove, that subjects of the King of England carry over our laws with them into a new settlement; which I do not controvert. A manor is not to be compared with the seignory of Maryland. The principal powers given to the proprietor of Maryland do not belong to the lord of a manor.

" The word *assigns* is necessary to make offices of trust transferrable; and the reason for omitting it in some parts of the Maryland charter, was to make some parts of the property unalienable. It is omitted in the grant of the seignory. It is said that kingdoms are devisable; but there is no instance of the devise of a dependent kingdom. I say this on the authority of *Craig.* Henry the VIII., and Elizabeth, had acts of Parliament.

" Lord *Mansfield.* By the feudal law, land was not devisable; much less a kingdom; though William the Conqueror claimed England under a will.

" Mr. Serjeant *Hill.* It is said, that recoveries on writs of right in manor Courts, have only been in the case of copyholds, and of lands in ancient demesne. But, in the cases I cited from *Benloe* and *Robinson,* of recoveries in the Courts Baron of Rising and Wol-

1826.

Cassell
v.
Carroll.

verhampton, the recoveries were of freehold land, and the words *secundum consuetudinem manerii*, which are used where the recovery is of copyhold, or ancient demesne, are not mentioned. The argument from the entails of copyholds, which are barrable by surrenders, supposes, that there is no custom to warrant another mode; but the argument of necessity fails here, for there is another mode. I give the same answer to the *cy pres* doctrine in the report to the Privy Council in Governor Wentworth's case.

" Lord *Mansfield.* The questions in this case are new, and of great difficulty. I have often considered them. I do not know of any litigated case before the present, in which the question has been, whether a seignory like that of Maryland can be aliened or devised. Both the Baltimore and Penn families have made their proprietorships the subjects of settlements and entails. As to the statute of William and Mary, it is strange that it should restrain from selling lands or proprieties to aliens; because, before that statute, they were incapable of purchasing. But, still, the words of the statute, which mention any right or propriety in any island or tract of land in America, by charter, or letters patent, furnish some argument. In the case of Penn and Baltimore, the question of alienation could not arise. There the suit was about an agreement as to the bounds of two Provinces; and it is certain, that a Province cannot be dismembered by aliening one part so as to be holden of another Province. Something might be incidentally said as to the point of alienation, but there could be no solemn adjudication, for the case did not require it. The jurisdictions and powers granted by the Maryland charter, are larger than those in any other. Doubts may arise as to the principality, from the nature of the property. Taking in execution, and other consequences of its being subject to alienation, may furnish strong reasons of policy against the power of alienating. The law being settled as to the principality, a secondary question will be, whether the lands or port duties can be severed from it. The rule of applying to America all the laws of England, in force at the time of settling a colony, is subject to many qualifications. The statute of charitable uses doth not extend to Antigua. There may be a difference, too, between the seignory and proprietorship of Maryland, and other estates here. The seignory and proprietorship passed under the great seal, and that carries the law of England. Another

thing quite new, is the question as to barring the entail. The history of barring entails in the Provinces is material. If there had not been provincial laws to regulate the barring of entails, it might have been proper to have supported the mode of barring by fines and recoveries in England. The necessity of the case might, perhaps, have justified it. But the provincial laws do not apply to the seignory and proprietorship of Maryland. The question as to them is entirely new, and of great difficulty. The pains taken to show, that a recovery might have been suffered in the Court of the Castle of Windsor, proves the force of the argument of necessity as to barring by alienation. The case of descendible freeholds, the entails of which are barred in that way, may have influence on the present case.

"The case was ordered to stand for argument a second time next Michaelmas term; and Lord Mansfield said, that, probably, several arguments would be necessary."