Bland, Chancellor.
The petition for the appointment of a receiver standing ready for hearing, the parties were heard by counsel, and the proceedings read and considered.
The defendants have not thought proper to put in a formal answer in writing to the plaintiff’s petition, but have been content with showing cause verbally. If a petition of this kind, bringing before the court a matter which could not have been made the subject of a mere motion, because of the necessity of putting upon the record the new facts therein set forth, and apprising the party of all the circumstances' on which the application is made, so as to enable him to controvert them, if he can; be not. regularly and properly denied by a written answer on oath, the whole, or so much of it as is not denied must, by analogy to the course of this court in similar eases, be taken to be true.(a)
I have so recently had occasion to consider the general nature and utility of the power of this court to appoint a receiver,(b) that it will be unnecessary upon this application to notice what has been said in argument as to the novelty, or the unsettled nature of the authority of. this court to make such an appointment, or as to the very oppressive purposes to which, it is said, it may be applied. It will be sufficient here again to observe, that I consider the matter as having been long since fully settled, and the power as one of as great utility as any which belongs to the court.
It has been mainly urged, that the court will not appoint a receiver against the legal title, but upon very special and strong ground. This is admitted. But the matter in controversy between these parties is a legal title, or it is nothing. This is a bill for dowerj a mere legal demand ; and the relief the plaintiff seeks is to have her particular estate set apart out of the general estate of the defendants, and to have the .rents and profits thereof accounted for. *213 To this it is objected, that a receiver cannot be appointed, because the claim of the plaintiff does not extend to the whole, but only to one-third of the property in controversy.
The appointment of a receiver does not involve the determination of any right; or affect the title of either party in any manner whatever: but still an application for such an appointment can only be made by those who have an acknowledged interest; or where there is strong reason to believe, that the party asking for a receiver will recover. I am of opinion, that the plaintiff has a sufficient presumption of title, to rest this application upon.(c) But unless she has also shown, that the rents and profits are in imminent danger, a receiverf cannot be appointed. A manifest abuse of a trust by an habitual and prospective course of dealing, bringing the property into danger, has been held to afford sufficient ground for the appointment of a receiver: but in no case has there been the least hesitation in making such an appointment, where the party in the actual receipt of the rents and profits was shown to be-insolvent. Here the property is in the hands and under the control of the defendant Samuel Chase:' and it is shown by the exhibits attached to the petition, that he has, pending this suit, actually obtained the benefit of the insolvent laws. He is, therefore, legally and in fact insolvent. Hence, it clearly appears that the rents and profits of the property in question are exposed to imminent danger, or indeed to inevitable loss.
A receiver is appointed for the benefit of the interested party who makes the application, and for any others who may choose to avail themselves of it, and who may have an interest in the property proposed to be put into the hands ' of a receiver. The immediate moving cause of the appointment is the preservation of the subject of litigation, or the rents and profits of it, from waste, loss or destruction; so that there may be some harvest, some fruits to gather after the labours of the controversy are over. The ulterior objects of the appointment are those contemplated by the suit itself; they are the several kinds of relief, which may be asked for qnd obtained by the complainant’s bill. Where the plaintiff claims the whole, as a purchaser or by a superior title, if he succeeds, it eventuates that the appointment was entirely and exclusively for his benefit.(d)
*214 But so far from such, being the only kind of cases in which a receiver has been appointed, they are in fact of the most rare occurrence. Where the plaintiff was a mortgagee, or a creditor suing in his own right alone, or for himself and other creditors, whose claims might or might not cover the whole amount ;(e) or where the object of the bill was to obtain a fair division of the property and to have debts paid;(f) or where the portions to which the contending parties would be respectively entitled was uncertain until a division should be made by the court; or where one tenant in common took the whole rents and profits -to the exclusion of his co-tenant; if the merits of the case required it, a receiver has been appointed and directed to take charge of the whole estate. And at the instance of a plaintiff who claimed as a purchaser, such an appointment has been made, even before answer, although it was urged in argument, that a married woman, who claimed a life estate under a post nuptial settlement, would be stripped by it of “ her only means of defence and subsistence.”(g) It does not appear from any of the cases, that such an objection as this now relied upon, has ever before been made by any one in relation to the appointment of a receiver; and, consequently, it cannot be regarded as- of any weight whatever. I shall, therefore, put a receiver upon this estate. But as no person has been nominated by the parties for that office, I must let the selection of a suitable person lay over until I hear from them.
Ordered, that a fit and proper person be appointed as a receiver, as prayed by the complainant’s petition, with full power and authority to enter upon and take possession of the messuage, and tenement in the bill of complaint mentioned; and to take care of, rent, or otherwise dispose of the same pending this suit, in such manner as he may deem most advantageous to the parties interested therein, subject to the further order of this court. And also with full power and authority to demand, sue for and recover any rent now due or which may hereafter become due for the same. And for the faithful performance of the trust reposed in such person to be appointed to act under this order, or which may be reposed in him by any future order of this court in the premises, *215 he shall give bond to the State of Maryland in the penalty of ten. thousand dollars, with surety or sureties to be approved by the Chancellor. The compensation of such receiver shall be hereafter determined on a consideration of his trouble, skill, and diligence in the premises. And it is further ordered, that on the fifth day of May next, a proper and suitable person will be appointed a receiver under this, order; provided, that on or before that day the parties may nominate and recommend for the appointment to the Chancellor, such person or persons as they or either of them may think proper.
Two of the defendants, Matilda Ridgely and Ann Chase, on the 4th of May 1826, filed their petition, objecting to the appointment of a receiver, which petition was then submitted to the Chancellor: but a decision upon it was postponed until a nomination of a receiver should be made. After which, on the 10th May 1826, a nomination was made, and the case was again submitted to the Chancellor.
9th June, 1826. — Bland, Chancellor. — Ordered, that the petition of Matilda Ridgely and Ann Chase, be dismissed with costs; and that Peter H. Cruse, of the city of Baltimore, be and he is hereby appointed a receiver under and according to the order of the 26th of April last.
After a receiver had been thus appointed and he had taken the property under his care, the case was prepared and brought on for a final hearing.
28th April, 1827. — Bland, Chancellor. — This case standing ready for hearing, the solicitors of both parties were fully heard, and the proceedings read and considered.
It appears from the bill as amended, and the plaintiff’s exhibits, that the late Samuel Chase, after and during his marriage with the plaintiff, became seized in fee simple of a certain real estate, situated within the city of Baltimore, called the Fountain Inn; which property, on the 26th day of February, 1806, he leased to James Bryden for the term of fifteen years, reserving an annual rent of 2000 dollars. The plaintiff, on a privy examination, acknowledged'the validity of this lease, and made a relinquishment of her dower in the usual form. Samuel Chase, the husband of the plaintiff, died on the 19th April, 1811. The lease to Bryden expired on the 26th February, 1821. Those who claimed under *216 the late Samuel Chase leased this property to Basil Williamson, who had the possession thereof when this bill was filed. The plaintiff claims one-third of this property as her dower; and she also claims a remuneration for the rents and profits of her third part from the death of her husband; and thereupon prays, that dower may be assigned to her; that the property may be sold for the payment of the rents and, profits due to her; or that the future accruing rents to which the defendants are entitled, may be sequestered or placed in the hands of a receiver to be paid over to her until she is satisfied; and generaEy, that she may have such relief as is suited to the nature of her case.
The defendants Barney and wife, and Cole and wife, submit the case to the justice of the court. The defendant Williamson declares, that he is totally ignorant of the plaintiff’s pretensions ; and, therefore, leaves her to sustain them; but admits, that he holds as tenant under some of the other defendants. The defendant Richard M. Chase disclaims all interest in the matter in controversy. And Hester-Ann, Matilda, and Frances T. Chase, the three infant children of the late Thomas Chase, who have been made defendants as heirs of their father, who was a defendant and died after he had answered, state their ignorance of the whole affair, and pray to have their interests protected. But, their father does not seem to have had any interest in this property, which could have been affected by the plaintiff’s claim; or if he had, it wiE be fully considered and disposed of in passing upon the defence which he jointly made, before his death, with three others of his co-defendants. Consequently, aE these defendants may be safely passed by without any further notice, and the case may be at once disencumbered of every thing in relation to them.
The deféndants Samuel Chase, Matilda Ridgely, and Jinn Chase, have put in a joint and several plea and answer. They alone claim the property, called the Fountain Inn. They contest the plaintiff’s claim altogether and in every shape. The whole opposition and the entire brunt of the controversy rest with them. They have couched their defence in the form of a plea and answer. The matter of their plea is extended over a wide surface in the foreground; and sets out all that mass of particulars of which their defence is composed. The matter of this plea amounts to this, that the plaintiff filed a bill against them on the 5th of July 1813, and another on the 14th of February 1814, in both of which *217 she claimed dower in this same property; that the matter of those suits was finally settled, and thus they were dismissed; and therefore, they plead those suits, the agreement, and the dismissal of them in bar of the claim now made by the plaintiff.
But' these defendants, not content with resting their case upon the matter thus set out by way of plea, have gone on to repeat the whole of the same matter, and' to rely upon it by way of answer. The bill always calls for an answer from the defendant as to all the matters of fact therein set forth. But one'- of the peculiar and proper offices of a plea is to present such a defence as shews, that the defendant cannot be compelled to make, or may well be excused from making such an answer as the bill calls for; and therefore, upon the ground of inconsistency, the defendant cannot be permitted, by way of plea, to aver, that he ought not to be compelled to answer, as called upon in relation to any particular matter, and at the same time to put his defence, as to the same matter, into the form of such an answer as the bill calls for. Hence if a defendant answers to any thing as to which he has pleaded, he thereby overrules his plea; for his plea is only why he should not answer, so that if he answers he waives his plea to the same matter. The same principle is equally applicable to demurring and answering, and to demurring and pleading to the same part. (h) The plea of these defendants must, therefore, be totally rejected ; as being overruled by the subsequent answer, covering exactly the same matter; and I have the less hesitation in thus striking it out, because it is evident, from the answer, that nothing at all necessary to the sound merits of the defence will be lost.
But in the answer itself, of these defendants, there are matters which may be safely banished from it without in the least enfeebling the force of the defence. That which is related of the matter of the bill, filed on the 17th of February, 1813, by this plaintiff and John P. Paca ; what is said about the letter, and the conveyances from John E. Howard to the late Samuel Chase; what is related of the late Samuel Chase's intentions to make advancements of property to his children ; and the allegations respecting the rough draft of his will, with some other particulars of less note, cannot certainly be at all material to the defence. I shall, therefore, lay them aside, as in no way necessary to the present matter in controversy.
*218 The defence rests on the following grounds; — -first, that the plaintiff has heretofore sued for dower in this property, and by the final termination of those suits her claim, if she ever had any, has been fully released or barred; secondly, that if she has not been thus solemnly barred, yet she is no’t in law dowable of this property, because her late husband never had a fee simple estate therein, but held only a mere equitable interest, as a mortgagee to secure the payment of money lent by him; thirdly, supposing these objections removed, that still her claim can be carried no further back than to the 26th of February, 1821, when the-lease to Bryden and her relinquishment of dower up to that period expired; and lastly, supposing her claim to be valid, that yet the two-thirds of this property, belonging to these defendants, can neither be sold nor sequestered as a means of satisfying the amount of the rents and profits, which’ may be decreed to her. These are the great points of defence. The nature and validity of each of which must now be carefully considered and determined.
With regard to the first point. The defendants Samuel, Matilda, and Ann claim this property, called the Fountain Inn, and allege, that the plaintiff has released, or is barred of dower therein, by the agreement, and the manner in which two suits, heretofore instituted in this court, to recover dower in the same property, have been finally adjusted and determined. If this allegation be well founded, there is an end of the Case; since it eannot be necessary to inquire, whether the plaintiff had been previously thereto dowable of this property; and much less to determine the extent to which she might have been entitled to recover.
This plaintiff, with John P. Paca, her trustee, filed a bill on the 17th of February, 1813, in this court, against the representatives of the late Samuel Chase, to recover a certain amount of money alleged to be due to her. After which she filed one bill on the 5th of July, 1813, and another on the 14th of February, 1814, in. which she presented herself as the widow of the late Samuel Chase, claiming dower in every parcel (the Fountain Inn, among the rest) of the real estate of which her late husband had been seized during their marriage, against his heirs, and all others, whom she had found in possession of any part thereof. To these suits the defendants appeared and answered- when the parties came to an agreement, designated in this case as the exhibit S. M., by which the matters in dispute in all three of them were to be adjusted or withdrawn. This written agreement is without 'date; *219 but the letter of Stephen and Magruder, dated on the 28th of September, 1816, speaks of propositions for compromising these suits as then depending. And the Chancellor remarks, at the foot of his decree in the first cause, dated the 17th of July 1817, that “ it is passed as being considered within the meaning of the agreement signed by the parties.” Consequently, this agreement S. M. must have been executed some time between those dates.
By the agreement S. M., a decree was to be passed in the first case in favour of the plaintiff for the amount demanded, with costs; which was done accordingly on the 17th of July, 1817. As to the second and third, or the dower cases, as they may be called, the instrument of writing declares, that “ It is also further agreed, that in the two last of the above causes, decrees shall pass giving the complainant dower in the following tracts, pieces or parcels of land, to wit,” — going on to specify certain property, without the least allusion to the Fountain Inn; and then proceeds in these words : “ Provided, it shall appear to the satisfaction of the Chancellor, by the exhibition of title papers or otherwise, as he may order, that the said Hannah K. Chase hath a right to dower in the shme. And it is further agreed, that a compensation in money shall be paid to the complainant by the defendants, for and'in lieu of her dower in the property abovementioned, and that such compensation shall be fixed by the Chancellor, upon evidence offered to him of the value of the said respective pieces or parcels of land, by the actual sales, where sales are to be made by the trustees as aforesaid, and for want of sales, by depositions shewing such value; to be taken before some justice of the peace for Baltimore county, residing in the city of Baltimore, by either party, upon giving-three days’notice. And it is further agreed, that the said. bills be dismissed as to all the property in the proceedings mentioned, not specified and included in this agreement. And that the complainant pay the costs.”
The motives, which induced the parties to enter into this agreement, are not expressed in the instrument itself; .nor can they be clearly inferred from any thing that is said in it. The first suit,instituted by Hannah K. Chase and John P. Paca, seems to have no sort of connexion with' the subsequent dower cases. According to the agreement, the plaintiffs, in that case, were to have a decree for all they asked; and then it proceeds to speak of the dower-cases, without making any allusion whatever to th.at case. Therefore, while confining our contemplation to the agreement alone, *220 the first case, and every thing relative to it, may be wholly laid aside.
Looking at this agreement, in relation to the dower cases alone, it seems to be wholly gratuitous, without any valuable consideration whatever moving from either party. The plaintiff was to recover nothing to which she could not produce a clear subsisting title. She was to be endowed of certain specified property, provided she satisfied the court, that she was entitled to dower therein. It is neither said nor insinuated, that she was to be endowed of any one parcel of land, in consideration of her relinquishing dower in any other parcel. In short, she was to be endowed of no land in which she was not legally entitled to dower; and to no greater amount than its exact value, to be determined by the court. The plaintiff agreed to dismiss her bills claiming dower, as to all the property not included in the agreement, and to pay all costs. This concluding branch of the agreement is perfectly in character with every other part of it. Like the rest, it is merely gratuitous; and, consequently, according to every principle of equity, it cannot be construed into a release of any right, beyond the express and irrisistible sense of the terms used.
The words of the agreement are, that “ the bills be dismissed." Suppose this agreement had been followed out by a formal decree, then the court must have dealt with the matter in the manner in which it was submitted; that is, it must have determined upon the rights of the parties as to all the property specified in the agreement; and as to the residue, it could only have ordered, in pursuance of the agreement, “ that the bills be dismissed with cosis.”(i) To make a decree a good and available bar, in any subsequent suit, it is not sufficient merely to shew, that the bill was dismissed; but the party must go further, and shew, that the matter of the bill was res judicata ; that there was an absolute determination by the court, that the party had no title.(j) But the Chancellor could not, in those cases, have given any determination in relation to the plaintiff's title to dower in the Fountain Inn; because he was deprived of the means of doing so by the agreement, which simply directed, that those suits as to that property should be dismissed with costs. No decree which the Chancellor could have pronounced in pursuance of that agreement, could have given to it any additional extent *221 or force as a bar against the present plaintiff. There was, however, no formal decree ever passed in those cases; they were closed on the 19th of July, 1819, by the short docket entry “ agreed,” evidently in reference to this written agreement.
The question, therefore, recurs upon the agreement alone. It is stipulated, that the bills be dismissed as to the property not included in the agreement. It is a contract to abandon those suits; but it is not a relinquishment of the right claimed by them. The two things are substantially different; and that difference, it appears from the whole phraseology of the agreement, was in the then contemplation of the parties. Much is directed to be done, to facilitate the speedy progress of the suit; the usual formal and tedious mode of collecting testimony, necessary to a correct decision upon the rights of the parties, is dispensed with; and the suits are to be brought to a close in a summary way ; but no right is ceded, no title is relinquished by either. party. On the contrary, we are told, that the plaintiff is to recover; provided, and only provided the Chancellor shall so determine. The defendants concede to the plaintiff nothing, absolutely nothing. They, therefore, can have no equitable ground to claim from her an abandonment of her rights. The agreement, that the bills be dismissed must be considered as referring to a mere voluntary dismissal by the plaintiff herself, which would leave her rights and interests untouched and unimpaired in all respects whatever.
This agreement is not so explicit as it might, and perhaps ought to have been; but, after mature consideration, I find enough in it to bring my mind satisfactorily to the conclusion, that it cannot be deemed a relinquishment of the plaintiff’s right of dower in the Fountain Inn. The solicitors on both sides have contended, that it is entirely unambiguous ; and yet they have had recourse to the proofs and circumstances to aid the interpretation respectively contended for. A few remarks upon those circumstances and proofs seem therefore to be required.
To the lease from the late husband of the plaintiff to Bryden, of the Fountain ínn, she made a formal relinquishment of dower. This lease did not expire until the 28th of February, 1821, some years after the commencement of the two former dower suits. This was an embarrassing circumstance. These defendants admit it to have been so considered at that time; for they say, in their answer, that, as they have been advised, the plaintiff’s acknowledgment of the lease to Bryden did not operate as a bar of her *222 dower; but merely as a suspension of execution during the term; and that the right to dower might have been determined in those suits. But, these defendants, not satisfied with telling us of the advice they had obtained, as to this apparent difficulty, have drawn forth that which was given to the plaintiff upon the same subject.
The policy of the law does not permit a solicitor to divulge the secrets of his client. Such confidential communications are not to be revealed at any period of time, either before or after the suit has been brought to an end, or in any other suit; for, as to all such matters his mouth is shut for ever.(k) A solicitor may refuse to act further for his client, but he cannot go over to the opposite party. (l) But this obligation of secrecy is the privilege of the client, not the incompetency of the solicitor. In this case, the defendants have called on the plaintiff’s solicitors to tell of their advice and opinions to their client and the plaintiff has not objected. She has waived her privilege. Hence her solicitors are legal and competent witnesses. It appears by their depositions, that their recollection of facts and occurrences which happened at the time of the agreement, about the two former dower suits, is very obscure and general. But there is no ambiguity in their letter of the 28th of September, 1816.
Their advice respecting this estate called the Fountain Inn, is remarkable; it is expressed in these words: — “ W e are of opinion you have no title of dower during Bryden’s lease; having relinquished your dower therein during said lease, which will expire in 1821. Whether upon the termination of said lease, you will be entitled to dower, is a question of some difficulty; and, perhaps, can only be solved by some further proof in point of fact relative to the nature and effect of the contract between the late Judge Chase and Bryden." And, after some further observations as to this contract, they say: — " We do not think, that this difficulty should prevent a settlement as to the residue of the property in which dower is asserted; in relation to which, we have reason to believe, no opposition will be made to your claim. If, before the lapse of five years, the question, as to Bryden’s property, should not be settled, the question between you will be narrowei down to a single point, in the adjustment of which we suppose no great *223 difficulty can take place.” After the receipt of this advice .the plaintiff signed the agreement S. M.
These circumstances and this letter fortify the construction I have put upon the agreement S. M. The plaintiff’s agreeing to dismiss her bills, as to the Fountain Inn, and also to submit to the payment of costs, is satisfactorily accounted for. It thus clearly appears, that so far from relinquishing any right, she then merely withdrew from before the tribunal, with a fixed resolution to return to the contest at a more convenient season; unencumbered with matters which might be then disposed of and finally- adjusted.
It is, therefore, my opinion, that neither the institution and termination of those suits, nor the agreement S. M., can in any manner whatever be considered as a bar, or release of the right now asserted by this plaintiff.
The next question is, whether the late husband of the plaintiff had an estate in the Fountain Inn during their marriage, of which she is dowable. It is admitted on all hands, that the legal estate in fee simple of this property was originally in Harry D. Gough; all who are any way concerned in this controversy deduce their interests from him; and, consequently, the only question now is, whether James Clarke, to whom Gough conveyed, and the late Samuel Chase, to whom Clarke conveyed, held as mortgagees from Bryden, or any one else; or whether Clarke, and from him Chase, obtained an absolute indefeasible legal estate in fee simple, or only an equitable interest.
It appears, by the recitals in the conveyance, dated the 4th of February, 1806, from James Clarke to the late Samuel Chase, that Harry D. Gough, who was seized of an estate in fee simple in the land covered by the Fountain Inn, had agreed to sell it to Daniel Grant, and gave his bond with a condition to convey it to him when he paid the purchase money. Grant sold his interest, and assigned this bond to James Bryden; and James Clarke and John Smith became Bryderi’s sureties for the payment of the balance of the purchase money due to Gough, and also for the sum which he had agreed to pay Grant. Bryden paid and satisfied Grant in full. Then Clarke, it is said, at the request of Bryden, paid Gough $7,216 42, the amount then due to him; who thereupon conveyed the fee to Clarke ; and Bryden delivered to Gough his bond. After which, at the request of Bryden, the late Samuel Chase paid Clarice the sum he had paid to Gough, and also paid to Bryden the sum of $10,283 58; amounting altogether to tíre sum of $17,500. *224 Whereupon. Clarke conveyed to Chase an absolute estate in fee simple. On the twenty-sixth of the same month, in which Chase had obtained this conveyance-, he leased the property to Bryden for the term of fifteen years, reserving an annual rent of $2000 ; to which lease Chase’s wife, the present plaintiff, added her relinquishment of dower in the usual form. And on the same day on which the lease bears date, Chase executed his bond to Bryden, stipulating, in the condition, that if Bryden should pay him the sum of $17,500, at the expiration of fifteen years from that time, and not before, or within one year thereafter, and not afterwards, that then he, Chase, would reconvey the property called the Fountain Inn to Bryden. After which, on the 2d of April, 1811, Samuel Chase, jun’r, one of these defendants, proposed to purchase this property of- the late Samuel Chase, and in that proposal he speaks of the dower of the present plaintiff as a then vested legal right. This proposal was matured, and the property was conveyed by- the late Samuel Chase to this defendant Samuel Chase, jun’r, in trust, or out of which he was to make provision for Matilda Bidgely and Jinn Chase, two others of these defendants, and daughters of the late Samuel Chase.
It has been urged, that Bryden always understood this contract between the late Samuel Chase and himself to be nothing more than a mortgage; and that he instituted a suit in this court to set aside this absolute conveyance from Clarke to Chase, and to be let in to redeem. It has also been urged, that Samuel Chase, one of the present defendants, under a conviction that Bryden had a good and available right, purchased his interest. -This may be all true; but surely the assertions of Bryden, however solemn or formal, or the mere acts or allegations of any of these defendants, not responsive to the bill, cannot be seriously regarded as a part of the legal and pertinent proofs in the case. Therefore, all these sayings and doings , of Bryden, and of these defendants, must be entirely put aside as foreign to the subject now under consideration. There is then, in fact, no proof whatever, in relation to the nature of the contract between the late Samuel Chase and James Bryden, other than that afforded by these several deeds and instruments of writing themselves.
The various contracts, made at different times, by the several parties concerned, from Gough to the late Samuel Chase, exhibit this matter in an obscure and circuitous form, from which it may be, in some degree, relieved and shortened, without enfeebling the pretensions of either of the present parties, by regarding Gough, *225 Grant, Clarke, and Bryden, as the persons who held the entire estate, legal and equitable; and as the grantors in fee simple to the late Samuel Chase, for the consideration of $17,500. It is clear from the indenture of the 4th of February, 1806, that the late Samuel Chase obtained the whole and entire interest of all those persons, as well at law as in equity; and became thereby vested with an absolute estate in fee simple. Because, it appears by the recitals of that deed, that he had paid Gough and Clarice for the legal interest they held; and that he had also paid for the equitable interest of Grant and. Bryden. From this deed alone, therefore, there can bé no doubt, that the late Sdmuel Chase held an estate in fee simple, of which this plaintiff is dowable.
But the bond of the 26th of February, 1806, it is said, shows that the previous contract, of the 4th of the same month, according to the true intention of the parties, is only to be regarded as a mortgage; that it is not, as it purports to be upon its face, an absolute sale; but a mere security for the loan of money from the late Samuel Chase to James Bryden. It ,is true, the court should, in cases of this nature, look into the various contemporaneous agreements and dealings between the parties to ascertain what was their design, and the real nature of their contract. (m)
This case is, however, susceptible of being still further simplified and reduced. Let it be supposed, that Bryden had obtained the entire estate in fee simple from Gough, Grant, and Clarke; and, being so seized, that he alone was the grantor by the deed of the 4th of February. Then, let this bond, of the 26th of February, be considered together with or even as a part of- that deed. The whole will read as an absolute sale, with nothing more than a condition for a re-purchase.
That this whole transaction, from whatever point of view it may be contemplated, can only be considered as an absolute sale, with a condition or covenant for a re-purchase, is manifest; because, it wants all the usual badges and characteristics of a mortgage. The money paid was, so far as appears, a fair price for the absolute purchase of such property; liable to much injury, requiring frequent repairs, and of fluctuating fashion and profits. Although Chase was not put into actual- possession, yet Bryden leased from him, and held as his tenant. Chase received the' rents and profits for his own use and benefit, and gave no account of them whatever. *226 The chief value of this lot of land within the city of Baltimore, consisted in there being a large edifice erected upon it, which was occupied and used as a tavern: the loss of which, if destroyed by fire or otherwise, must have been borne by Chase ; as it was held at his risk entirely. (n) There was nothing of that reciprocity so essentially necessary to constitute a mortgage. It is as essential that the one party should have it in his power, at some specified time, to compel the re-payment of the money, or to foreclose, as that the other should have it in his power to redeem. But, although Bryden might re-purchase for a stipulated sum at any time, during the sixteenth‘year after the date of the contract, yet Chase could not compel Bryden to pay any sum of money, at any time: Chase took no bond, or other collateral security from Bryden ; nor is there any clause in any deed or conveyance, by which Bryden covenants or promises to pay Chase any sum of money. If the edifices had been destrojmd, or the property had been ever so much reduced in value, Chase could have recovered nothing of Bryden. The contract is, therefore, utterly destitute of that mutuality always incident and necessarily belonging to a mortgage of any description.(o) But it appears, by the lease from Chase to Bryden, that this contract was, notwithstanding the bond, regarded as an absolute sale with a condition to re-purchase, and nothing more, by Bryden himself; for, he obtained and accepted a relinquishment of the right of dower of the wife oí-Chase. And it appears, from the proposals of Samuel Chase, one of these defendants, made on the 2d of April, 1811, that he also, then considered the contract as an absolute sale; for, he speaks of this plaintifPs then existing right of dower.
Upon the whole I am satisfied, that the late Samuel Chase was seized of an estate in- fee simple in this property, of which the plaintiff, as his widow, is entitled to dower.
The next inquiry is, as to the extent of the recovery. Some of the authorities cited in reference to this branch of the case, related exclusively to the modern creatures of equity, called terms attendant upon the inheritance, which Were not clearly recognised and defined in England until about the year 1670; and which have, so far as I can learn, never been introduced into this State, and are not likely to become fashionable among us. The equitable principles *227 in relation to these attendant terms, and the distinctions between them and legal terms in gross are entirely foreign from the present subject of consideration.
The lease from Chase to Bryden created a legal term in gross; and the rent reserved was an annual rent service. It is to this particular estate which the acknowledgment of the plaintiff refers. Suppose the late Samuel Chase had, previously to his marriage with the plaintiff, executed such a lease as this to Bryden. How would the plaintiff’s claim of dower have been affected ? It is clear, that a woman may be endowed of a rent service, rent charge, or rent seek. And, to use the words of the most accurate and profound of the English lawyers, “ If the husband maketh a lease for years, reserving rent, and taketh wife, the husband dieth, the wife shall be endowed of the third part of the reversion by metes and bounds, together with the third part of the rent, and execution shall not cease during the years.”(p) But if a particular estate for years be carved out of the inheritance, prior to the marriage, without the reservation of any rent whatever, then the widow can only recover her dower in the reversion, with a cesset executio during the term.(q) Hence it is certain, that, if this lease to Bryden had been made prior to the marriage, this widow would- have been entitled to dower in the reversion, and in the rent immediately from the death of her husband.
The question then resolves itself into this: has the plaintiff’s acknowledgment placed her in the same, or in a different situation from that she would have been in, had the lease to Bryden been made before her marriage? At one time, an opinion prevailed, that a feme covert could, in no way, bar or divest herself of her right of dower during her coverture. But, we are told, there can now be no question, that if the husband and wife levy a fine, the wife is barred for two reasons. First, Because the intermarriage and seisin are the fundamental causes of dower, and the death of the husband but as an execution thereof. Secondly, Because all those who have estate, or title, or claim, join in the assurance; and, therefore, in such case, if the husband and wife have made a lease rendering rent to the husband and his heirs, and afterwards the wife recovers dower, she shall hold it charged with the term; since it is a maxim, that all lands in fee simple may be charged in one way or other. But in such case, as where the land had been *228 thus charged before marriage, the wife would be dowable of the reversion and the rent;(r) so, if the husband and wife join in levying a fine to effect a mortgage, and nothing more, the wife’s interest will be affected to the extent of the mortgage, and no further. She will have a right to redeem, and may call on the personal representatives of her deceased husband to discharge the mortgage debt out of his personal estate, so as to free her dower from all incumbrance.(s)
It may be regarded as a rule, that the interest of a feme covert, who joins in levying a fine, will be affected no further than according to the express intention of the fine. Hence, if its only object be to improve the title and give additional security to the lessee for years, or mortgagee, her rights will be impaired in no respect not necessary for that purpose, and she will be allowed to take her dower in like manner as if such lease or mortgage had been made before the marriage.
To prevent the creation of perpetuities, it is laid down as a general rule of law in England, that all lands may be charged or aliened in one way or other. The mode of conveyance must be adapted to ,the nature of the case; but, if the proper method be pursued, the alienation may, in most cases, be made effectual whatever may be the nature of the estate or interest of the grantor. If it be an estate tail, it may be barred by a fine or common recovery; or if, by reason of the peculiar nature of the estate, a fine cannot be levied, or a common recovery had, then a deed or common conveyance will be sufficient.(t) And in all cases, a feme covert, if she be of full age, may alien her fee simple estate, or relinquish her claim to dower by means of a fine. Fines were always binding upon married women; though it was thought proper to make them liable to examination by a statute of the year 1290 ;(u) but it was not merely by the examination that the fine had its efficacy, (v) The mode of conveyance by fine is couched in the form of a suit upon an agreement; as to which the wfife is examined by the judges of the court apart from her husband, so that it may appear to them, that she perfectly understands what she is about to do, and freely gives her consent to it; and if they doubt of her age, they may examine her upon oath, before they pronounce *229 their judgment. (w) Upon which a peculiar efficacy is ascribed to the agreement, so that it is not open to objections which would be fatal to an agreement of a married woman, authenticated in any other way: for there is no other form in which a court of common law can, with the consent of a feme covert, give validity to her agreement concerning her estate ; and there are few cases in which even a court of equity can, with her consent, enable her to dispose of her property, real or personal.(x) This solemn and embarrassing mode, by which alone married women are enabled to dispose of their rights and interests in real estate may have been, and may yet be well suited to the circumstances and state of society in England; but it is obviously unsuited to the state of things in our country, and much more so formerly, when land titles were so frequently and informally transferred from one to another as to have been, for some time, among the most current instruments of traffic among the colonists ;(y) tiran now when real estates have become better settled and more permanently held.
In Pennsylvania, and many of the other colonies, it had become usual for married women to dispose of their lands or to relinquish their right of dower by a common deed, or instrument of writing executed and authenticated as if they had been sole; which conveyances were afterwards confirmed, and the custom of making such deeds, with their consent, taken on a private examination, was adopted by legislative enactments. (z) In Virginia, where the mode of conveyance by fine was never in use, following, as it would seem, a local custom of Wales, or of London,(a) it had become usual for married women, in- order to effect a valid conveyance of their lands, or relinquishment of their dower, to make an acknowledgment of the deed in a private examination before the general or county court,(b) which mode of conveyance was afterwards confirmed and adopted by the colonial legislature. (c)
In Maryland, although it is said, that lands were sometimes conveyed by fine passed in the provincial or county court,(d) or by common recovery ;(e) yet it would seem, that there had been many instances of conveyances made, in the form of mere common contracts, with intention to bind the interests of married women as if *230 they had been sole, which were afterwards ratified and confirmed.(f) But it appears, that the provincial legislature of Maryland at a very early period made provision for quieting possessions and establishing the manner of conveying lands by deed acknowledged and recorded ;(g) and prescribed that form of private acknowledgment of conveyances of real estate and relinquishment of dower from femes covert, (h) which has been reenacted and continued in force from that time forward by the now existing law.(i) Since the passage of which law the method of conveyance by fine has been disused, and indeed may be now considered as having sunk into total oblivion. (j)
*231 The acknowledgment of a feme covert to a deed, as prescribed by the act of assembly, it is obvious, was introduced as a substitute for a fine; and although a deed of bargain and sale, so acknowledged, will not, like a fine, as relates to the interests of third persons, work a discontinuance, (k) yet as regards the ferns covert herself it as effectually, and to a like extent, passes her interest as a fine.(l) Hence an acknowledgment of a feme covert, made according to the act of assembly, like that made on levying a fine, can operate only so far, and no farther, than the deed itself, to which it is annexed, would operate, according to its nature, supposing it to have been made by the husband before the marriage, or by herself alone wdiile sole.
It is, therefore, my opinion, that the acknowledgment of this plaintiff to the lease to Bryden, can only be construed as an improvement and further security to Bryden's title; and that, on the death of Samuel Chase, the plaintiff became immediately entitled to dower in the reversion of the Fountain Inn; and also in the rent reserved by that lease, without delay of execution during the term.
At law, the widow can recover, damages or mesne profits for the detention of her dower only from the time it was actually demanded of the heir. And if the jury fail to assess damages for the detention, she can recover no costs ; because costs are given only where damages are recovered. (l) But in equity it is otherwise ; here it is the course of the court to assign her dower, and universally to give her an account of the rents and profits from the death of her husband. But where the heir throws no difficulties in her way,, and admits her claim, she has no costs.(m) In this case, however, it appears, that every possible opposition has been made to this plaintiff’s claim, (n) As to the value of the rents and profits, one-third of the rent reserved by the lease to Bryden, and no more, can be recovered during that term. After that time the actual *232 value must be the criterion. For, as it is said, if a wife be entitled to dower of land worth no more than five dollars per acre, and the heir by his industry or by building thereon makes it worth fifty dollars per acre; the widow shall have her dower according to the improved value. So, on the other hand, if the property be impaired, she can recover only according to the reduced value.(o) But the heir is entitled to no allowance for meliorations and improvements. The account of the rents and profits must be taken according to these principles. Interest must be allowed on the rent from the time it became due or was actually paid by the tenant, as it shall appear. (p)
There is yet one other branch of this case to be disposed of. The plaintiff prays, that the two-thirds of this property, not covered by her claim, may be sequestered or sold to satisfy the amount which maybe awarded to her for rents and profits. I have been referred to no authority which would warrant' a sequestration or sale as prayed; nor do I know, that there is any such authority to be found. Perhaps the power to sequester might have been thought to rest upon principles similar to those on which I founded the order appointing a receiver. The cases are, however, widely different. The sole object of appointing a receiver is to take care of the subject about which the parties are contending, and to prevent it from being wasted or lost. Such an appointment involves a decision upon no right; and cannot affect any point in controversy. But a sequestration, or sale, makes a temporary or a total disposition of the property, which can be done in no instance where the matter is not put in issue by the nature of the case, and a sequestration or sale is not expressly authorized. From the nature of the decree, here called for, the title of the defendants and their enjoyment of the two-thirds must be left undisturbed. It is their property. But, like any other property belonging to them, it will be subject to seizure, and sale under v. fieri facias upon a decree commanding them to pay the plaintiff a specified sum of money, should they fail to comply. These prayers of the plaintiff must, therefore, be rejected.
There may be some difficulty in assigning the plaintiff dower in this property, owing to its peculiar nature. It is represented to be a large and valuable edifice, chiefly or altogether occupied as a *233 tavern. And it may turn out, upon inquiry, that it is incapable of being advantageously occupied in any other way; or perhaps of being divided at all. A rent may be given for equality of partition or in lieu of dower; which in its nature will be distrainable of common right.(q) I shall therefore, in the decree appointing the *234 commissioners to lay off and assign the plaintiff’s dower in this property, leave sufficient latitude for them to report specially all circumstances ; and also in the alternative. So that the final decree maybe adjusted to suit the case, after the parties have been heard. As to the rents and profits the case will be sent to the auditor.
Decreed, that the said Hannah K. Chase, the plaintiff, is entitled to dower in all that messuage, tenement, and lot of land jn the proceedings mentioned, called the Fountain Inn. -And to the end that this court may be enabled to make a just assignment to the plaintiff of her dower in the aforesaid messuage, lands and tenements, it is ordered, that a commission issue to Benjamin C. Bid-gate, William Magruder, James Mosher, and Robert C. Long, of the city of Baltimore, authorizing them or any three of them to go-upon, walk over, survey, lay off and designate one-third part of the said premises as and for the dower of tire said plaintiff in the same; and that the said commissioners be directed in the commission to make out a plot and certificate exhibiting an accurate description of -the third part or dower so by them laid out. And if they shall be of opinion, that the said messuage and lot of land cannot be divided, in the manner which they shall so specify,, without injury to the same, and disadvantage to the parties, they shall express their reasons for such opinion, state all circumstances they may deem material, and proceed to designate and describe specially in what other manner the said plaintiff may be endowed of the said property, without any, or with less injury thereto, and *235 without any, or with less disadvantage to all concerned. And the said commissioners shall make return of their proceedings to this court, as soon as may be, subject to its further order upon the same. And to the said commission there shall be annexed the usual oath of office.
And it is further decreed, that the defendants, Samuel Chase, Matilda Ridgely, and Ann Chase, pay unto the said Hannah K. Chase, the plaintiff, one-third part of the rent reserved by the lease to the said James Bryden, from the 19th of April 1811, (the day of the death of the said late Samuel Chase,) until the expiration of the said lease; and further, that the said defendants pay unto the said plaintiff one-third part of the rents and profits of the said property, in the proceedings mentioned, from the termination of the said lease until the time of the said plaintiff’s being put into possession of her dower in the said premises.
And for the purpose of having an account taken of the said rents and profits, it is further decreed, that this case be and the same is hereby referred to the auditor, with directions to state an account or accounts, from the proceedings and proofs in the case, or from such other testimony as may be laid before him by the parties. And it is further ordered, that each party on giving to the other, or her, or their solicitor three days’ notice, as usual, be and they are hereby authorized to have testimony taken before the commissioners appointed to take testimony in the city of Baltimore, in relation to the rents and profits of the premises, to be used before the auditor and the court; provided it be taken and filed with the register on or before the first day of June next.
A commission was issued as directed by this decree, and the commissioners in their return, filed on the 29th June, 1827, state a mode in which it was practicable to have the dower specifically assigned; but they say, .they are unanimous in the’ opinion, derived from a patient, careful and cautious examination, that the location would tend to the manifest injury and disadvantage of the parties; the property having been expressly constructed for a tavern, &c. See. But the defendants having appealed froin this decree, the Court of Appeals on the 25th July, 1828, dismissed the bill with costs.

 Shipbrooke v. Hinchingbrook, 13 Ves. 393; 2 Harr. Pra. Chan. 40, 129, 133.

 Williamson v. Wilson, 24th April, 1826, post 000.

 Stitwell v. Williams, 6 Mad. 49; Clark v. Dew, 1 Rus. & Myl. 103; Davis v. Marlborough, 2 Swan. 146.

 Lloyd v. Passingham, 16 Ves. 59; Davis v. Marlborough, 2 Swan. 125.

 Thomas v. Dawkins, 3 Bro. C. C. 508; Bowersbank v. Collasseau, 3 Ves. 165; Wilkins v. Williams, 3 Ves. 588; Hughes v. Williams, 6 Ves. 459; Bryan v. Cormick, I Cox. 422; Dalmer v. Dashwood, 2 Cox. 378.

 Skip v. Harwood, 3 Atk. 564.

 Metcalfe v. Pulvertoft, 1 Ves. & Bea. 180.

 Gilb. For. Rom. 58; Mitf. Tr. 320; Beams’ Pl. Equ. 39.

 Rowe v. Wood, 1 Jac. & Walk. 345.

 Brandlyn v. Ord, 1 Atk. 571; Mitf. Tr. 238; 2 Mad. Cha. 312; Beam. Pl. Eq. 218.

 Vaillant v. Dodemead, 2 Atk. 524; Sandford v. Remington, 2 Ves. jun. 189; Richards v. Jackson, 18 Ves. 472; Parkhurst v. Lowten, 3 Mad. 121; Arnot v. Biscoe, 1 Ves. 95; Wilson v. Rastall, 4 T. R. 753; Bul. N. P. 284.

 Cholmondeley v. Clinton, 19 Ves. 272.

 Sevier v. Greenway, 19 Ves. 412.

 Co. Litt. 205, n. 1; Pow. Mort. 125, note P., and 138, note T.

 Tasburgh v. Echlin, Pow. Mort. 133; Thornborough v. Baker, 3 Swan. 631; Goodman v. Grierson, 2 Bal. &. Bea. 279; Robertson v. Campbell, 2 Call. 421; Roberts v. Cocke, 1 Rand. 121.

 Co. Litt. 32. a.

 Pow. Mort. 687, note P.

 Co. Litt. 343; Lampet’s case, 10 Co. 49.

 Pow. Mort. 677, note B.

 Otway v. Hudson, 2 Vern. 584; Moore v. Moore, 2 Ves. 601; Everall v. Smalley, 1 Wils. 26.

 18 Ed. 1, stat. 4; Kilt. Rep. 146.

 Richards v. Chambers, 10 Ves. 587.

 2 Inst. 515.

 Richards v. Chambers, 10 Ves. 580; Ritchie v. Broadbent, 2 Jac. & Walk. 456.

 Land H. A. 77.

 Davey v. Turner, 1 Dal. 11; Lloyd v. Taylor, 1 Dal. 17; Watson v. Bailey, 1 Binn. 470; Jackson v. Gilchrist, 15 John. 89.

 Dyer, 363, b. Crui. Dig. tit. Dower, c. 4, s. 15.

 1 Virg. Stat. 145, note,

 2 Virg. Stat. 317.

 Hammond’s Lessee v. Brice, 1 H. & McH. 323.

 1766, ch. 21.

 1671, ch. 6; 1694, ch. 11; Land H. A. 214.

 1663, ch. 7.

 1674, ch. 2, s. 5; 1692, ch. 30, 3. 5; 1699, ch. 42, s. 6.

 1715, ch. 47. Rhea v. Rhenner, 1 Peters, 105.

 Hammond’s Lessee v. Brice, 1 H. & McH. 323; Kilt. Rep. 146.
The recording of deeds and conveyances of land in Maryland may, at first view, seem to have been intended altogether and exclusively for the benefit of landholders; but the lord proprietary had also a considerable interest in it; because by the tenure on which he granted his lands, he reserved to himself a small annual quit rent, and a fine for every alienation; and the recording of deeds and wills afforded the means of ascertaining and collecting that brajich of his revenue. — Land H. A. 233, 244, 259, 266. Land Office Records, Journal of the Board of Revenue. The first General Assembly of the Republic resorted to the same sources of information for the purpose of correctly taxing real estate, by directing, that the then late receivers of the quit rents for each county should make out lists, from their last debt-books, of the names and quantiiy of acres of every tract of land within the counfy, and to whom the same belonged or ought to he charged, and. to deliver such lists to the commissioners of the tax for the county. — February, 1777, ch. 21, s. 22. Since then the acts which have been passed for the assessment of taxes upon property have required the register of the land office, and the clerks of courts, by whom deeds are required to be recorded, to furnish the commissioners of the tax with lists of alienations of lands thus shewn by their records, in order to ascertain to whom the tax should he charged, 1803, ch. 92, s. 37 &. 38, &c.
The fines for alienation, or the casualties of the feudal law were taxes upon the transference of land both from the dead to the living, and from the living to the living. In ancient times they constituted, in every part of Europe, one of die principal branches of the revenue of the crown; which, like all such taxes, fell most heavily upon the necessitous or the poor; and, so far as they diminished the capital value of the property so taxed, tended to diminish the funds destined for the maintenance of productive labour. — Smith’s W. Nations, b. 5, c. 2, app. to art. 1 § 2. The fines payable to the lord proprietary on every such transfer here also, as it appears, constituted a considerable portion of his revenue. — Cassell v. Carroll, 11 Wheat. 134.
The registration of mortgages, and in general of all rights upon immovable property, says an enlightened philosopher, as it gives great security to both creditors and purchasers, is extremely advantageous to the public. — Smith’s W. Nations, b. 5, c. 2, app. to art. 1 & 2. Yet an eminent English lawyer has delivered it as his settled conviction, that a general registry, throughout England, would entail a great and certain expense on property for a very uncertain benefit. Because a general registry wantonly exposes the concerns of all mankind; and by the negligence of an agent, a *231 purchaser or mortgagee may lose the estate, if the seller or mortgagor fraudulently sell or mortgage to another person whose deed is the first registered, and questions upon the priority of registered deeds often lead to litigation. — Sugden’s Letters on Sales, &c. 47.

 Lawrence v. Heister, 3 H. & J. 377; Mayson's Lessee v. Sexton, 1 H. & McH. 275; Nicholson’s Lessee v. Hemsley, 3 H. & McH. 409.

 Colegate D. Owing’s case, post 000.

 William v. Gwyn, 2 Saund. 45, note; Pow. Mort. 718, note P; 2 Harr. Ent. 698.

 Curtis v. Curtis, 2 Bro. C. C. 632; Dormer v. Fortesque, 3 Atk. 130.

 Lucas v. Calcraft, 1 Bro. C. C. 134; Worgan v. Ryder, 1 Ves. & Bea. 20; 2 Mad. Chan. 564.

 Co. Litt. 32, a.

 Tew v. Winterton, 1 Ves. jun. 451; Baird v. Bland, 5 Mun. 492; Davis v. Walsh, 2 H. & J. 344.

 Co. Litt. 144, 169; Turney v. Sturges, Dyer, 91; Dacre v. Gorges, 2 Sim. & Stu. 454; Com. Dig. tit. Annuity, (A. 3.); Warfield v. Warfield, 5 H. & J. 459.
Corse v. Polk. — The bill, filed on the 10th of December, ISIS, states, that Alexander Stewart, and Mary his wife, being seized of certain lands, in her right, by deed conveyed them to Warner Razin to hold in trust for the use of them and the survivor for life, remainder to their children; that they are both dead, leaving only three children the parties to this suit; that the defendants are infants. Prayer for a partition. The defendants Polk and wife made answer admitting the statement of the bill. Rebecca R. Stewart answered by guardian, also admitting the allegations of the bill. The trustee does not appear to have been made a party. On the 1st of April, 1819, an interlocutory decree to make partition was passed, and the usual commission was issued, and a return made thereon.
16th July, 1S19. — Kilty, Chancellor.- — Ordered that the return made by the commissioners under the interlocutory decree for partition be confirmed; unless cause shewn before the 1st day of September next; provided a copy of this order be served on the defendant, James Polk, and on the guardian of Rebecca R. Stewart, before the 15th day of August next.
The commissioners returned, that they had divided the lands as described, &c. and then say, “they do further certify and return, award and adjudge, that the said Unit Corse and Mary his wife, pay to Rebecca R. Stewart, the sum of one thousand and ninety-seven dollars and thirty-three and a third cents, and to James Polk and Ann Maria his wife, the sum of five hundred and thirty dollars and .eighty-three and a third cents.” The defendants filed objections to this return, because among other things, “the said lands are capable of a specific equal division, and ought to have been so divided among the respective claimants according to quantity and quality.”
15th February, 1821. — Kilty, Chancellor. — An order was passed during the present term, to wit, on the 25th of January, 1821, for a healing of the objections filed by James Polk at March term next on notice; but the parties having since submitted them on notes in writing, they are now taken up for consideration.
I do not view the commission or any part of the proceedings as being ordered under the act to direct descents ; but under the provisions of the common law as to partition, which is exercised by the Chancery Court, and is recognised by the act of 1794, ch. 60. Of course a sale could be ordered as suggested by the counsel of J. Polk, and a partition must in some way be made.
The parties have not had any further survey or taken proof under the order of December term 1819; the counsel for J. Polk relying on his objections, that the commissioners had not complied with their directions.
The objections drawn from the terms of the commission are not considered valid. An equal division may exist where the difference in quantity or quality is made up in money. The assignment of the several parts, although it has not been expressed in the commission, is included in the power to divide. It is conformable to the practice where the commissioners think proper so to do; and if they omit it, the assignment to each party is made by the court by lot, for which however there is no express authority.
*234 On this view of the case, I should deem it proper to confirm the return if aa examination of the plot had been made according to the rule of the court; that not being the case, the decision will be postponed till March term, the order of December term 1819 being still in force as to the survey and procuring testimony in support of the objections against them.
The plots having on motion been delivered as ordered, to the solicitor of the party, were laid before the examiner general, and after having been revised by him, were again returned to the court. After which the commissioners made and returned a valuation of the lands, of which they had made partition, but the valuation is not mentioned in the final decree.
26ih January, 1822. — Johnson, Chancellor. — Decreed, that tire partition so made, &c. &c. “And for the purpose of making an equal division in value, it is further adjudged, ordered and decreed, that Unit Corse and wife, pay to RebeeeaR. Stewart, the sum of one thousand and ninety-seven dollars, thirty-three and one-third cents, and to James Polk and wife, the sum of five hundred and thirty dollars, and eighty-three and one-third cents, which said sums of money axe adjudged and declared to be a lien on lot number one in this decree mentioned. Each party to these proceedings to bear an equal proportion of the costs of these proceedings.”